**STATE**

v.

**David ELLIS.**

No. 91–518–C.A.

Supreme Court of Rhode Island.

Jan. 12, 1993.

James E. O'Neil, Atty. Gen., Jane McSoley, Jeffrey Greer, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Paula Rosin, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

WEISBERGER., Justice.

This case comes before us on the defendant's appeal from a judgment of conviction of murder in the first degree entered in the Superior Court. We affirm. The facts insofar as pertinent to his appeal are as follows.

In the early morning of February 3, 1988, a security officer employed by Brown University discovered a man lying on the ground on India Street in Providence near the Brown University boathouse. It was apparent that the man was dead, a portion of his head having been blown apart by a blast from a shotgun. The man was later identified as Jeffrey Patrick (Patrick). Later that morning members of the Providence police department examined the scene. They found a spent and a live twelve-gauge shotgun shell and seized them. Representatives of the Bureau of Criminal Investigation examined shoe and sneaker prints in the vicinity and made impressions.

Detective Robert McKenna (McKenna) of the Providence police department was assigned to take charge of the investigation. He learned from other officers in the department that Patrick had allegedly been stabbed by David Ellis, who had been charged with the crime of assault with intent to murder in November of 1987. McKenna learned that those charges had later been dropped at Patrick's request. A Providence patrolman, Thomas Fitzpatrick, informed McKenna that the deceased had been seen in the company of one Carolyn Skinner (Carolyn), around 1 o'clock on the morning of February 3 on Rhodes Street in Providence.

McKenna then ascertained Carolyn's address through a motor-vehicle check. He and his partner, Detective Jack McCau-

ghey, went to the address they had been given, 44 Ayr Street in Central Falls. They were accompanied by several officers of the Central Falls police department. When the officers knocked on the door of Carolyn's third-floor apartment, they received no response. They then went to the second-floor apartment occupied by Christine Skinner (Carolyn's sister-in-law). Christine stated that she believed Carolyn was at home at the time and further told the police that Carolyn lived with her young daughter, Chelsea, and her boyfriend, David Ellis, in the third-floor apartment. McKenna and the accompanying officers returned to the third-floor apartment and after several unsuccessful attempts to elicit a response (including a telephone call from the Central Falls police station), the police contacted the apartment-building manager and asked that he come to the apartment house. The manager, Sean Gavin, arrived, bringing his keys to the apartment. He also told the officers that he had been in the apartment three days earlier and had noted the presence of two shotguns, with pistol grips, that he believed were owned by defendant David Ellis (Ellis).

At this point Gavin attempted to open the apartment door, but his keys did not work. McKenna then knocked at the door again, whereupon the door was opened by Carolyn. She kept the security chain on the door, but at McKenna's request she opened the door, telling the officers that her daughter, Chelsea, and Ellis were in the apartment in addition to herself. When they entered the apartment, the police saw Chelsea and instructed her to go into the kitchen and remain there with her mother.

The police found Ellis lying on a bed with his right hand concealed under a pillow. He was told several times to remove his hand slowly, and he eventually complied. The police then handcuffed Ellis, and as they were doing so, they discovered in his clenched fist a vial holding a substance that appeared to be cocaine.

At this juncture Carolyn signed consent forms permitting the police to search the apartment and two automobiles that were parked in the driveway and owned by her.

On a dresser next to where defendant had been lying, McKenna saw a Mossberg shotgun, a gun-cleaning kit, and a box of shells. Another shotgun was found inside a bedroom closet. It was later determined that the fatal wound to Patrick's head had been caused by a shot from the Mossberg twelve-gauge shotgun discovered in the apartment.

Sergeant Michael Long and other officers checked the cars in the driveway. Long opened the trunk of a red Dodge Aries automobile that had no license plates. In the trunk he found splattered blood and human flesh. More blood and flesh were noted outside the car as well. Personnel from the Bureau of Criminal Identification also found in the trunk a large plastic garbage bag that contained a blanket dotted with organic tissue, possibly from a human brain. Similar tissue was found in the bottom of the plastic bag. The police also found a live shotgun shell in the trunk, wadding from a shotgun shell, and a piece of bone, possibly from a human skull. Nine days later, Carolyn approached members of the Providence police at the Garrahy Judicial Complex and told them that she had found certain items in the trunk of her brother's car. She stated that these items included a pair of bloodstained sweatpants and sneakers that had been worn by Ellis on the night of Patrick's death. There was also a pouch containing green shotgun shells. Christine Skinner, the wife of Carolyn's brother, gave permission for the police to search the car and seize the items to which Carolyn had referred.

Shortly after his arrest in the Central Falls apartment, Ellis was taken to the Providence police station where he was informed of his *Miranda* rights. He admitted that he had been in the company of Patrick on the night of his death but stated that after a visit to a Zayre's store on Silver Spring Street in Providence where Patrick had shoplifted a belt and after repairing a fuse in the red Dodge that Ellis was driving, Ellis claimed, he drove Patrick to South Providence and dropped him off at Rhodes Street. Ellis then stated that he drove back to Central Falls.

At trial Carolyn testified that she and David Ellis had been engaged in selling cocaine in Providence for about a year before Patrick's death. Carolyn testified that Patrick was employed by Ellis and Carolyn as a "runner" and an altercation had arisen between Patrick and Ellis, stemming from an accusation that Patrick had stolen a gold chain from Ellis. She stated that in the course of the argument Ellis told Carolyn that he stabbed Patrick who later filed charges against Ellis. Carolyn further testified that Ellis threatened to kill Patrick if he did not drop these charges. Carolyn stated that Patrick called Ellis to state that he dropped the charges and produced papers to substantiate his statement. According to Carolyn, Ellis expressed suspicion to her that Patrick had not really dropped the charges but had simply produced false papers. She further testified that in the early morning of February 3 when Patrick and Ellis left the apartment together, Ellis had taken a shotgun with him. The reason expressed at the time was that they were going to confront a man with whom Patrick and Carolyn had earlier had an altercation.

Carolyn further testified that later that morning Ellis returned and told Carolyn that he had shot Patrick twice in the head at close range. According to her testimony, Ellis then showed Carolyn the automobile, and she noted what appeared to be brain matter inside the trunk and vomit on the rear end of the car. She stated that Ellis removed a sweatsuit, the bottom half of which was covered with blood. He also removed blood-spattered sneakers. She said that Ellis then held a blowtorch to the gun in an attempt to destroy the barrel.

Don DiBiasio, owner of D & B Gun store in Providence, testified that Ellis came to his store on February 3, 1988, to inquire about purchasing a new barrel for a Mossberg shotgun that he had previously purchased at the store.

David Ellis testified in his own defense. He admitted having stabbed Patrick in a quarrel over a gold chain. He stated, however, that he knew that Patrick had dismissed the charges and that consequently he and Patrick had resumed their friendship before Patrick's death. He further testified that on the night of the shooting Carolyn left the apartment with the intention of going in Patrick's company to sell drugs. She later returned and stated that Patrick had been shot at Fox Point. Ellis stated that he and Carolyn drove to Fox Point and that he viewed the body but that when he realized that he could do nothing he left the scene.

Doctor Kristen Sweeney of the Office of the State Medical Examiner performed the autopsy. She stated that Patrick had died as a result of a shotgun blast to the head. She expressed the opinion that the barrel of the gun had been held no closer than three feet and no farther than six to eight feet from Patrick's head when the gun was fired. Gary Kanaski, an agent of the Federal Bureau of Investigation, stated that a shoe-print impression left at the scene was the same size and design as one of Ellis's sneakers but since the sneaker did not have any unique identifying character, he was unable to say with certainty that it was the shoe that had made the impression at the scene.

In support of his appeal defendant raises six issues. These issues will be discussed in the order in which they are raised in defendant's brief. Further facts will be supplied as necessary to deal with these issues.

I

Limitation of Argument

■ The trial in the Superior Court took place over a period of six days. Twenty-one witnesses testified. Prior to final argument the trial justice announced in chambers that she would limit the argument to forty minutes on each side. Counsel for the state stated that this time was agreeable, but counsel for the defense objected to the limitation. The court recessed after the chambers conference and resumed the next morning. Counsel for the defense began his argument at 9:36 a.m. and concluded at 10:25 a.m. He had argued for a total of forty-nine minutes when he concluded. Shortly before concluding

his argument, counsel had asked the trial justice whether he had additional time to complete his argument. The trial justice responded, "[G]o ahead." After the jury retired for its deliberations, following final argument by counsel for the state, defense counsel objected on the record. He stated that he felt that he did not have sufficient time to discuss rebuttal testimony that had been offered by the state. The trial justice then expressed an opinion that defense counsel had presented an extremely thorough argument to the jury and had not been prejudiced by the time limitation.

The defendant argues that the time limitation imposed by the trial justice was a violation of defendant's Sixth Amendment right to the assistance of counsel as enunciated in *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

In *Herring* the Court stated with great emphasis that counsel for the defendant in a criminal case should have the opportunity to marshal the evidence before submission of the case to judgment. However, the Court went on to comment further:

"This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion. See generally 5 R. Anderson, Wharton's Criminal Law and Procedure § 2077 (1957). Cf. American Bar Association, Project on Standards for Criminal Justice, The Prosecution Function § 5.8, pp. 126–129, and the Defense Function § 7.8, pp. 277–282 (App. Draft 1971)." 422 U.S. at 862, 95 S.Ct. at 2555, 45 L.Ed.2d at 600–01.

In a challenge to a limitation of argument to one hour, this court observed that there was no rule of criminal procedure that defines the limit of time for final argument, *State v. Pemental*, 434 A.2d 932, 937 (R.I.1981), and that the trial justice would have latitude in determining the duration and extent of closing arguments. In *Pemental* we noted that Rule 51 of the Superior Court Rules of Civil Procedure limits arguments for civil cases commenced in the Superior Court to one hour and for cases commenced in the District Court to forty minutes. *Id.*

■ In the absence of a specific allotment of time in the rules of criminal procedure for final argument, it would be the obligation of the trial justice to allow a reasonable time. As we have said in other contexts, the trial justice is in the best position to determine the period that would be required to marshal and sum up the evidence for the benefit of the jury. We would admonish trial justices to attempt to give defense counsel adequate time to perform this important and demanding task. However, we believe that no principle enunciated in *Herring* or *Pemental* would justify this court's holding that an argument of forty-nine minutes duration is not a reasonable time in the circumstances obtaining in this case.

It must be noted that the attention span of trial jurors is not unlimited and that a suggestion to counsel of a time limitation may actually cause counsel to focus upon the issues in such a fashion as to emphasize the important without spending time on the trivial. It should further be noted in the case at bar that the trial justice did not cut off the argument of defense counsel but indeed, upon inquiry, invited him to "go ahead." Therefore, if defense counsel had thought it vital to continue his argument beyond forty-nine minutes, there is every reason to believe that the trial justice would not have inhibited him from so doing.

Consequently we find no indication that the limitation suggested by the trial justice at the chambers conference and her ultimate allowing of a forty-nine-minute argument constituted such prejudice to defendant as to amount to reversible error.

## II

### Exclusion of Opinion on Redirect Examination

■ As part of defendant's case John McAllister, a probation officer, was called to testify. McAllister had known Ellis for many years and also knew Patrick. He stated that in January of 1990 he saw Ellis and Patrick together in the Garrahy Judicial Complex, when McAllister was assigned to the Sixth Division District Court. He asked Ellis what he was doing at the courthouse, and in reply Ellis stated in front of Patrick that Patrick was about to withdraw the charges against Ellis. This evidence was relevant on the issue of defendant's ill will or a lack thereof toward Patrick because of Patrick's having brought a complaint of assault with intent to murder against Ellis. McAllister testified on direct examination that defendant and Patrick seemed friendly.

On cross-examination counsel for the state asked the witness whether he knew if Patrick had been threatened or was at the courthouse voluntarily. McAllister replied that he did not know. On redirect examination counsel for defendant asked McAllister if Patrick looked as though he had been threatened or was in court against his will. On the state's objection the trial justice ruled that this question was improper. The defendant argues that pursuant to Rule 701 of the Rhode Island Rules of Evidence opinion testimony by a lay witness is permissible in the following circumstances: "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions is limited to those opinions which are (A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

The defendant further cites *State v. Fogarty*, 433 A.2d 972 (R.I.1981), wherein we stated before the adoption of our present rules of evidence that the more progressive rule would be to allow "the short-hand rendition of such external appearances as intoxication by lay witnesses as long as the witness has had an opportunity to observe the person and to give the concrete details on which the inference or description is founded." *Id.* at 976. We are in agreement with defendant's contention that the shorthand rendition of observation, such as intoxication or other bodily conditions, may be rationally based on the perception of the witness and may be helpful to a clear understanding of the witness's testimony. Nevertheless, we are of the opinion that the question in issue called for an opinion or conclusion that was neither rationally based upon the perception of the witness nor helpful to a clear understanding of the witness's testimony.

There is no rational basis upon which a witness can determine that another person looks as though he has been threatened or is in court against his will. There was no inhibition against defense counsel's inquiring concerning the appearance of Patrick or the witness's perceptions that might be based upon external observations. However, it can scarcely be contended that in the ordinary course of events a lay witness is able to determine such inner feelings as might arise if a person was threatened. This is a question that a lay witness (and probably most expert witnesses) would be totally unqualified to answer.

Therefore, in sustaining the objection to this question, the trial justice committed no error.

## III

### Admission of Photographs of the Deceased

At trial the state introduced a number of photographs of the body of the victim. Two of these photographs had been taken at the scene of the crime. A number of photographs were later introduced during the testimony of the medical examiner. These photographs had been taken at or near the time of autopsy. During the testimony of Detective Walter Williams of the Bureau of Criminal Identification, counsel for the state offered as a full exhibit a photograph of a bone fragment found in one of the cars.

■ Generally defendant argues that the trial justice abused her discretion in admitting these photographs (save one black-and-white photograph taken at the scene) on the ground that the probative value of the photographs and of the fragment of bone was outweighed by their prejudicial effect. The defendant further argues that the relevance of these exhibits was minimal in view of the fact that defendant did not contest the fact that the victim had died from a grievous wound. We have pointed out in a number of cases that photographs and other exhibits, even though unpleasant and graphic, may in the discretion of the trial justice be introduced in order to sustain the state's burden of proving each and every element of the crime. *See, e.g., State v. Bertram*, 591 A.2d 14 (R.I.1991); *State v. Lionberg*, 533 A.2d 1172 (R.I.1987); *State v. Ware*, 524 A.2d 1110 (R.I.1987); *State v. Fenner*, 503 A.2d 518 (R.I.1986). As we stated in *Fenner* in determining whether the display of a grievous wound would be unduly prejudicial, the test is whether the sight is of such a nature as "to inflame the jurors and therefore prejudice them beyond the ordinary prejudice that is always sustained by the introduction of relevant evidence intended to prove guilt." 503 A.2d at 526. We cited *State v. Cline*, 122 R.I. 297, 405 A.2d 1192 (1979), for the proposition that a defendant had no right to be insulated from relevant evidence. *State v. Fenner*, 503 A.2d at 526.

■ A murder committed in such fashion that the victim's head is blown apart by a shotgun blast is in itself a horrendous occurrence. The verbal depiction of evidence tends to be shocking to those in attendance at the trial. Every photograph and exhibit tends to be gruesome. Nevertheless, as we have stated in the past, the state bears the burden of proof on all issues. The question is not simply whether the victim has been shot by a blast from a gun. The nature and identity of the gun, the distance from which the shot was fired, all must be established by the state in its proof.

It is all very well for defendant or his counsel to set forth on appeal that which was disputed and that which was not. The state in presenting its evidence can take nothing for granted. The cause of death and the circumstances of death are highly relevant.

We have examined the photographs that were introduced and agree with defendant that they are unpleasant and gruesome, but this is a gruesome crime. We are of the opinion that the jurors who sat as triers of fact were not so inflamed by these photographs as to be unable to weigh the testimony and determine the question of guilt or innocence in a rational and an impartial manner.

Just as defendant did not deny that the victim had been killed by a shotgun blast, so too the jurors in the case, by reason of the trial justice's directions, realized that the question before them was whether this defendant had committed the crime with which he was charged. The exhibits submitted were not of such a nature as to divert the jurors from this task.

The trial justice in admitting the challenged exhibits committed no abuse of discretion.

## IV

### The Admissibility of Defendant's Statement to the Police

The defendant argues that the statement given by Ellis to the police should not have been admitted by the trial justice since it was obtained as a result of wrongful detention in violation of the Fourth Amendment. *See, e.g., Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The lynchpin of defendant's argument is that when the police arrested and handcuffed Ellis, they did not have probable cause to believe that he had committed any cognizable offense. The Superior Court justice who heard the motion to suppress this statement found that at the moment of arrest the police had seen a vial of crack

cocaine in defendant's hand. On this basis he held that the police had probable cause to arrest and that thereafter the statement made after *Miranda* warnings was admissible. The defendant argues that the police did not see the vial of cocaine until after he had been handcuffed. Therefore, he suggests that the arrest preceded the finding of the cocaine and cannot rest upon this discovery for its validity. For purposes of our decision in this case, we shall accept defendant's argument. However, we are of the opinion that the police had probable cause to arrest defendant without reference to his possession of crack cocaine.

■ We have defined probable cause as knowledge of those facts and circumstances along with reasonable trustworthy information that would cause a prudent officer to believe that the suspect had committed a crime. *State v. Pacheco,* 481 A.2d 1009, 1021–22 (R.I.1984); *In re John N.,* 463 A.2d 174, 178 (R.I.1983); *State v. Welch,* 441 A.2d 539, 541 (R.I.1982). We had also stated in *In re Armand,* 454 A.2d 1216, 1218 (R.I.1983):

"[A] general principle applicable here is that the mosaic of facts and circumstances must be viewed cumulatively 'as through the eyes of a reasonable and cautious police officer on the scene, guided by his or her experience and training.' * * * Moreover, in our review we must examine the completed mosaic in terms of what the police knew, what they heard, and what they observed as trained officers."

■ We also stated in *Armand* that our function on review of a determination of probable cause is to make an independent examination of the record to determine whether factors existed that established probable cause for an arrest. *Id.* We accept the facts as found by the trial justice unless they are clearly wrong or unless he or she has overlooked or misconceived material evidence. *Id.*

■ In the case at bar, assuming that the trial justice misconceived the officer's testimony concerning the time that the vial of crack cocaine was discovered and assuming that the seizure of defendant took place a split second before, we must exercise our independent judgment to determine whether the police had probable cause to arrest defendant without reference to the vial of cocaine. In the exercise of our independent judgment, we believe that the officers did have such probable cause. In *State v. Brennan,* 526 A.2d 483, 485 (R.I.1987), we quoted *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527, 544 (1983), for the proposition that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." We went on to state that "we independently examined the record to determine whether the 'mosaic of facts and circumstances' on which the arresting officer relied in arresting the defendant—viewed cumulatively through the eyes of a reasonable, cautious police officer guided by his or her experience and training—established probable cause." *Brennan,* 526 A.2d at 485. The mosaic "may reflect the collective knowledge of the police department, as long as the arresting officer relied on that knowledge." *Id.*

In the instant case, Detective McKenna and his colleagues on the Providence police department knew with certainty that a brutal crime of homicide had been committed. They knew that the homicide had been implemented by a shotgun blast. They further knew that one David Ellis possessed two shotguns in the apartment that he shared with one Carolyn Skinner. They further knew that Ellis had stabbed Patrick a relatively short time prior to Patrick's death. They knew that Patrick had been instrumental in the filing of charges against Ellis for the crime of assault with intent to murder. They may have known that Patrick had dropped the charges later. The officers were made aware just prior to their entry that Ellis was in the apartment and possessed two shotguns with pistol grips. We believe that this knowledge and information together with rational inferences that could be drawn therefrom created probable cause to believe that Ellis had shot Patrick with a shotgun. It is true that when the officers went to Carolyn's apartment they had intended only to interrogate

her. The kaleidoscopic progression of events gave rise to information that Ellis was inside along with Carolyn and her daughter. The officers acted instinctively.

When the officers saw Ellis lying on the bed with his hand beneath the pillow, they had reason to believe that he might well be armed and dangerous. When, after repeated commands, he withdrew his hand from beneath the pillow, the officers immediately handcuffed him.

The question of whether the officers had subjectively formulated in their own minds the mosaic of facts giving rise to probable cause may well be blurred by their immediate finding of a vial of crack cocaine that provided an alternative ground for a custodial arrest.

We have often said that there is a great difference between probable cause and proof beyond a reasonable doubt. *State v. Read,* 416 A.2d 684, 689 (R.I.1980); *State v. Joseph,* 114 R.I. 596, 601, 337 A.2d 523, 526 (1975); *State v. Nerney,* 110 R.I. 364, 365, 292 A.2d 882, 883 (1972). Perhaps no case is more illustrative of the distinction between probable cause and proof beyond a reasonable doubt than *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), in which the Supreme Court of the United States found probable cause based upon inferences drawn from the very limited facts of a heavily loaded automobile heading from a source of liquor in Joplin, Missouri, toward Vinita, Oklahoma.

■ In the case at bar the officers obviously relied upon what they knew and the inferences they had drawn when they handcuffed Ellis. The validity of the arrest should not be based upon whether the officers articulated the rationale with precision as they performed the arrest. *See New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (the subjective motivation of an officer does not determine the validity of his action).

■ We find that there were ample grounds to support Ellis's arrest at the time he was handcuffed, without reference to the vial of crack cocaine. Relying upon facts and information within the officers' knowledge and from which reasonable inferences might be drawn to create probable cause for a reasonable officer to believe that Ellis had shot Patrick, the motion justice committed no error in declining to suppress defendant's statement made at the police station hours subsequent to his arrest. We sustain the motion justice's ruling even though we do so on grounds different from those upon which he relied. *See In re Joseph J.,* 465 A.2d 150 (R.I. 1983), and cases cited therein.

V

Carolyn Skinner's Grand Jury Testimony

The defendant argues that his motion to dismiss the indictment should have been granted on the ground that Carolyn had testified falsely before the grand jury. He asserts that Carolyn failed to admit that she was selling drugs with Patrick on the night of his death. She further testified to the grand jury that she returned to her home that evening between 8 and 10 p.m. and did not leave again. This testimony, defendant asserts, was not consistent with that of a Providence police officer who saw Carolyn with Patrick at one o'clock the following morning. Her testimony concerning the time that Ellis told her that he had shot Patrick was inconsistent with the indicated time of Patrick's death between 1 and 3:30 a.m. on February 3, 1988.

There is no question that there were many inconsistencies in Carolyn's testimony at the bail hearing, before the grand jury, and also at trial. Presumably these inconsistencies were pointed out by counsel for defendant in the course of trial. The state had no choice in its presentation of Carolyn. She was without question the chief witness to whom defendant had allegedly admitted shooting Patrick. Her background and business enterprise made her credibility open to question by both prosecution and defense.

It appears that Carolyn made statements that did not fully disclose her drug enterprises. Certain of her statements were inconsistent with others. Certain of her

statements were inconsistent with other information known to the prosecution. However, the prosecution had little choice save to present Carolyn to the grand jury.

 We have stated on numerous occasions that we do not review the grand jury's determination in deciding to return an indictment on the grounds of adequacy of evidentiary support. In *Lerner v. Moran*, 542 A.2d 1089, 1093 (R.I.1988), and in *State v. Acquisto*, 463 A.2d 122, 127 (R.I. 1983), we quoted with approval the standard for reviewing indictments established by the United States Supreme Court in *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397, 402–03 (1956): " '[A]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charges on the merits. The Fifth Amendment requires nothing more.' "

As in *Lerner v. Moran*, numerous instances may be found in which witnesses before the grand jury may shade their testimony to protect their own interests and may make statements that are inconsistent with statements that they make later or with statements made by other witnesses. Neither we nor the Supreme Court of the United States conduct minitrials to determine the adequacy of evidence presented to the grand jury. We do not require that evidence that may later be determined by counsel for the defense to be exculpatory must be presented to the grand jury on pain of dismissal of the indictment.

In *United States v. Williams*, — U.S. —, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), this very question was considered by the Supreme Court of the United States. In an opinion by Justice Scalia the Court held that a United States District Court may not dismiss an otherwise valid indictment because the government failed to disclose to the grand jury "substantial exculpatory evidence" in its possession. Justice Scalia described the grand jury as an accusatory rather than an adjudicative body. *Id.* at —, 112 S.Ct. at 1742–44, 118 L.Ed.2d at 365–67. He went on to observe

that motions to quash indictments based upon the sufficiency of evidence relied upon by the grand jury have never been allowed and that it would therefore make little sense to scrutinize the sufficiency of the prosecutor's presentation. *Id.* at —, 112 S.Ct. at 1746, 118 L.Ed.2d at 369.

The state must take its witnesses as they find them. *See State v. Chiellini*, 557 A.2d 1195 (R.I.1989), which requires that a defendant must demonstrate a defect in the very essence and function of the grand jury. In the case at bar the essential testimony given by Carolyn Skinner was found to be truthful and consistent by the trial jury, in spite of the fact that defendant pointed out inconsistencies and alleged inaccuracies. It was also found by the trial justice to be substantially truthful. In light of these determinations we see no basis to fault the trial justice in her refusal to grant the motion to dismiss the indictment.

## VI

### The Rule 16 Violations

 During the course of the trial the state supplemented discovery by providing anticipated changes in Carolyn's testimony. These changes departed from earlier discovery given by the state concerning the substance of her testimony. Everyone agrees that Carolyn was a difficult witness. The trial justice recognized that Carolyn had changed her proposed testimony but she further found that there had been no willful violation of Rule 16 by the prosecution and that new information given by the state was not prejudicial to defendant's case. Many of the changes in Carolyn's testimony dealt with peripheral information concerning her drug activities and the encounter of a man who had threatened her with a handgun on the night of Patrick's murder. It appeared that the state exercised every effort to apprise counsel for defendant of information concerning Carolyn's testimony as soon as she made it available to counsel for the state.

Viewing the testimony as a whole and the information provided by the state to defense counsel, we believe that the trial justice did not abuse her discretion in declining to grant the defendant's motion to pass the case.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed. The papers in the case may be remanded to the Superior Court.