**Supreme Court**

No. 2012-238-C.A.

(P2/11-105AG)

State                                  :

v.                                  :

Rafael Ferrer.                                  :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                          :

v.                             :

Rafael Ferrer.                 :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, Rafael Ferrer, was convicted by a jury on one count of carrying a pistol without a license and one count of possession of a firearm by a person previously convicted of a crime of violence.  He has appealed from that conviction.  This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After a close review of the record and careful consideration of the parties' arguments (both written and oral), we are satisfied that cause has not been shown and that this appeal may be decided at this time. For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction.

**I**

**Facts and Travel**

On January 20, 2011, the State of Rhode Island filed a criminal information charging defendant with one count of carrying a pistol without a license in violation of G.L. 1956 § 11-47-

- 1 -

8(a) (Count One) and one count of possession of a firearm by a person previously convicted of a crime of violence in violation of § 11-47-5 (Count Two).[1]

Prior to trial, defendant stipulated that he had been previously convicted of a crime that satisfied the predicate offense element set forth in § 11-47-5. So that the jury would not learn of that criminal history, defendant agreed that, if he was convicted on Count One, he would "automatically be adjudged convicted" on Count Two. Accordingly, a jury trial was held on Count One in October and November of 2011. We summarize below the salient aspects of what occurred at trial.

## A

## The Testimony of Trooper Brent Pereira

Massachusetts State Police Trooper Brent Pereira testified at trial. It was Trooper Pereira's testimony that he was working on the evening of September 12 and the early morning hours of September 13, 2010 as part of a construction detail on Interstate 195 in Seekonk, Massachusetts. He testified that he left the construction detail and began following a "dark-colored green Toyota Rav4" in a westerly direction on Interstate 195; he did so after receiving a radio message advising him to be on the lookout for a dark-colored sport-utility vehicle (SUV) that was possibly traveling towards Providence. He further testified that that radio message also informed him that the SUV had multiple occupants ("most likely three"), who were described as being dark-skinned Hispanic males. It was his testimony that, while following the SUV, he drove his police cruiser alongside the right side and then the left side of the SUV and that he illuminated the interior of the SUV with his "cruiser-mounted spotlight" from both sides in order

---

[1] The defendant was also charged in that criminal information with one count of possession of a firearm by a person who is a fugitive from justice in violation of G.L. 1956 § 11-47-5 (Count Three), but the state dismissed that count pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

to observe the occupants; he added that he observed a female driver and three male occupants, who appeared to him to be dark-skinned. According to Trooper Pereira's testimony, he decided to continue to follow the SUV as it drove into Rhode Island so that he could conduct a motor vehicle stop when "backup" became available; he learned that there would be "backup" available on the right side of westbound Interstate 195 just before the Iway Bridge.

Trooper Pereira testified that, as he approached the bridge, he saw that there were other state police cruisers occupying the breakdown lane as well as the right travel lane just before the beginning of the bridge; he stated that the cruisers had their overhead red and blue emergency lights activated. Trooper Pereira added that he turned on his emergency lights to signal the SUV to pull over. He testified that the SUV drove past the other police cruisers and came to a stop in front of them; he added that the guardrail on the right side of the bridge was approximately three or four feet from the passenger's side of the vehicle. Trooper Pereira further testified that he stopped his cruiser at a point between ten and fifteen feet behind the SUV. According to his testimony, there were overhead lights on the bridge, and he had his headlights, searchlight, and "takedown" lights (bright white lights located on the light bar on top of the cruiser) fixed on the back of the SUV. He answered in the affirmative when asked on direct examination whether he could "clearly see into the rear of that vehicle," and he stated that he observed two black males in the backseat of the SUV. Trooper Pereira also stated: "I opened my cruiser door and I stepped half way out and I got onto my PA system." According to his testimony, he then saw that the passenger in the right rear seat of the SUV had moved slightly to the side and extended most of his arm out of the right rear window. He further testified that he observed a "grayish metallic object released from [that] arm and go over the guardrail." It was Trooper Pereira's testimony that he turned and mentioned to a Rhode Island trooper that he had seen one of the passengers

- 3 -

throw something over the guardrail; he added that troopers then searched the area below the bridge.

Trooper Pereira testified that he then proceeded to instruct the occupants of the SUV to place their hands on the ceiling while remaining inside of the SUV. He further testified that he instructed the right rear passenger to extend his arm outside of the door through the window and to open the door from the outside, walk to the trooper's location, and assume a kneeling position; he added that, after the right rear passenger complied, he asked the man his name and was informed that it was Rafael Ferrer. At trial, he identified defendant as the right rear passenger of the SUV. Trooper Pereira stated that, after all four occupants of the SUV were in custody, another trooper directed his attention to the area below the bridge to the right side of where the SUV was stopped. He stated that he observed a firearm on an abutment approximately twenty to twenty-five feet down.

**B**

**The Testimony of Trooper Daniel Hernandez**

Rhode Island State Police Trooper Daniel Hernandez testified next. Trooper Hernandez testified that, shortly after 12 a.m. on September 13, 2010, he responded to the Iway Bridge to assist a Massachusetts State Trooper, whom he identified as being Trooper Pereira, in connection with a motor vehicle stop. Trooper Hernandez testified that, when he arrived at the Iway Bridge, Trooper Pereira's cruiser was parked behind a dark-colored SUV in the breakdown lane and that he was outside of his car, giving instructions to the right rear passenger of the SUV to slowly exit the vehicle. At trial, Trooper Hernandez identified defendant as the right rear passenger.

Trooper Hernandez testified that he then spoke to Trooper Pereira, who informed him that he had "observed the occupant throw something out of the vehicle and it went over the side

- 4 -

of the bridge." Trooper Hernandez stated that he went "down around to the intersection of Tockwotton Street and South Water Street" in order to investigate the area that was below the bridge and perpendicular to the passenger's side of the SUV. In response to being asked why he focused on that area, he stated:

> "Because it was below the vehicle. Lined up. It made sense. If something was thrown from a vehicle, it would -- it could -- likelihood that it would land there."

Trooper Hernandez testified that, after climbing up to the second tier of the bridge abutment, he found a handgun lying on its side approximately fifteen to twenty-five feet below and ten to fifteen feet perpendicular to the part of the bridge where the SUV was positioned; he added that, from where he was standing when he discovered the handgun, he could see the SUV. He testified that there were four or five live ammunition rounds around the handgun and that there was one "spent cartridge that was half in the cylinder of the revolver." He testified that, although the abutment was dirty and sandy, the handgun was not. Trooper Hernandez identified the handgun shown to him at trial as being the same one that he had observed on the abutment.

## C

### The Testimony of Corporal John Grassel

Rhode Island State Police Corporal John Grassel also testified at trial, after first having been qualified by the trial justice as an "expert in crime scene evidence collection." He testified that, on the morning of September 13, 2010, he was called to assist other troopers at a crime scene located at "South Water and Tockwotton Street * * * in the area of the Iway Bridge." He stated that at that crime scene he recovered from the bridge abutment a .38 caliber revolver, one cartridge casing which was partially inside one of the chambers of the gun, and five cartridges in the immediate vicinity of the weapon; he identified the handgun entered into evidence at trial as

being the same handgun that he observed on September 13, 2010. When he was shown at trial a photograph of the handgun lying on the abutment, Corporal Grassel pointed out that the photograph showed a glass bottle near the handgun, and he testified that he had observed that glass bottle when he recovered the handgun near the abutment. Corporal Grassel stated that, while there was debris including sand, gravel, and cigarette butts on the abutment where he recovered the gun, "the firearm was relatively clean, as far as soot or soil," whereas the bottle "had a layer of soot or sand on it."

According to Corporal Grassel's testimony, the firearm was tested for fingerprints approximately six months after it was seized. He further testified that there were no latent fingerprints on "the cartridges, the cartridge, the cartridge casing, or the weapon;" however, he added that the chance of finding fingerprints "would definitely be less after six months." Corporal Grassel stated that the bottle was neither seized nor processed for fingerprints. He also stated that it was determined that the firearm had been lawfully purchased in Maine; it was his testimony, however, that he never inquired of the registered owner (who was not defendant) as to how the firearm came to be located on the bridge abutment.

**D**

**Stipulations and the Defendant's Motion for a Judgment of Acquittal**

Following Corporal Grassel's testimony, it was then stipulated: (1) that, on September 13, 2010, defendant did not have a duly issued license to carry or possess a firearm; and (2) that the firearm at issue was operable on that date. At the close of the prosecution's case, defense counsel moved for a judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. The trial justice found that the evidence, when viewed in the light most favorable to the state, was sufficient to warrant a jury verdict of guilt beyond a reasonable doubt

on Count One and, therefore, automatically, on Count Two. In denying defendant's motion, the trial justice stated:

> "The evidence, if viewed in that regard, together with all reasonable inferences, the testimony is that the officer viewed the individual, later to be identified by him as your client, in the right rear passenger seat of the vehicle throwing a metal object, as he described it, out of the window of the vehicle over the wall of the bridge. Later, the area was inspected below that parapet. The only thing that was found was a firearm and an old bottle, the inference fairly being that this was the object that was thrown from the vehicle and thrown by your client."

After the trial justice's denial of defendant's Rule 29 motion, the defense proceeded to present its case.

**E**

**The Testimony of Lina Leav**

The driver of the SUV, Lina Leav, testified for the defense. She testified that she was driving her 2002 Toyota Rav4 SUV westbound on Interstate 195 on the night of September 12 and the early morning hours of September 13, 2010. Ms. Leav testified that Rafael Ferrer, a friend of her boyfriend, was a passenger in the SUV and that he was seated in the rear seat on the driver's side (the left side); she added that a man named Pablo, whom she had met that night and whose last name she did not know, was sitting in the rear seat on the passenger's side (the right side). She further testified that, as she was entering Providence near the Iway Bridge, she was pulled over by a State Police cruiser. It was her testimony that she drove past the police cruisers that were already positioned in the breakdown lane and parked on the bridge; she added that the police cruiser which signaled her to pull over then stopped approximately one car length behind her SUV—at an angle so that the cruiser was "closest to the driver's rear quarter" of her SUV. She stated that the trooper told her and the other occupants to put their hands on the ceiling and

then asked them to "roll" down the windows. She also testified that the trooper told the passengers to exit the SUV one by one, opening the car doors by extending their arms through the open windows. According to her testimony, Pablo, who occupied the rear passenger's seat, was the first person to exit the SUV, followed by defendant, Rafael Ferrer.

Ms. Leav testified that no one threw anything out of the SUV when it was being pulled over because the windows were rolled up. She further testified that she did not see anything thrown out of the windows when the trooper requested that the windows be rolled down. It was her testimony, however, that her attention was focused "only" on the state trooper, and her testimony indicated that she observed him by using her "driver door mirror." She answered in the affirmative when asked on cross-examination if she was not paying attention to the backseat passengers.

**F**

**The Defendant's Renewed Motion for a Judgment of Acquittal, the Jury Instructions, and Defense Counsel's Closing Argument**

At the close of defendant's case, defense counsel renewed his motion for a judgment of acquittal; the trial justice again denied the motion "for the reasons given previously by the court."

The trial justice proceeded to instruct the jury. Among the instructions given to the jury, the trial justice stated that the jury should not consider punishment in its deliberations because punishment "should never be considered by the jury in any way in arriving at an impartial verdict."

Defense counsel thereafter made his closing argument to the jury, during which the following exchange occurred between defense counsel, the prosecutor, and the trial justice:

"**[Defense Counsel]**: There should be some corroboration of the facts of this case. How many times have you heard recently in the news people who are serving 20 years in jail for a rape or murder they didn't commit?

"**[State]**: Objection.

"**[Trial Justice]**: I'm not going to stand for that. I told this jury that issues relating to punishment shouldn't even be a topic of their discussions, and it better not be in -- continue to be part of your comments.

"**[Defense Counsel]**: That wasn't my intention, but my point is every day people are found to have not committed a crime --

"**[State]**: Objection.

"**[Trial Justice]**: Be careful, [Defense Counsel].

"**[Defense Counsel]**: I understand, Judge. -- because of scientific evidence. Do you really think that mistakes are only made in those types of cases, or do you think that they're made across the board just every now and then? There's not that type of DNA evidence or something else to exonerate the person. I suggest to you that's exactly the case in this situation. The defense never had the opportunity to have that weapon fingerprinted. It was in the custody of the State Police.

"**[State]**: Objection.

"**[Trial Justice]**: Sustain that objection."

Ultimately, the jury found defendant guilty on Count One. The trial justice then proceeded to rule, pursuant to the parties' pretrial stipulation, that defendant was also automatically guilty on Count Two.

In due course, on January 12, 2012, the trial justice sentenced defendant to two concurrent terms of ten years to serve on Counts One and Two. Defense counsel agreed that defendant was subject to the habitual offender statute codified in G.L. 1956 § 12-19-21, and the trial justice, pursuant to that statute, also sentenced defendant to a term of twenty years

imprisonment, with eight years to serve without the possibility of parole and the remaining twelve years suspended, with probation, to run consecutively to the ten-year sentences.

The defendant filed a notice of appeal on February 10, 2012.[2] On appeal, defendant makes two arguments: (1) that the trial justice erred in denying his motion for a judgment of acquittal; and (2) that the trial justice "violated his right to assistance of counsel under the United States and Rhode Island constitutions by improperly restricting defense counsel's closing argument."

## II

## Analysis

## A

## Motion for Judgment of Acquittal

The defendant argues that the trial justice erred in denying his motion for a judgment of acquittal because the evidence presented at trial did not prove beyond a reasonable doubt that "Mr. Ferrer (and not another occupant) threw a gun (and not another object) out of the SUV." (Parentheticals in original.)

Rule 29 of the Superior Court Rules of Criminal Procedure provides that "a judgment of acquittal shall be entered when the evidence is not legally sufficient to sustain a conviction." State v. Lopez, 78 A.3d 773, 780-81 (R.I. 2013) (internal quotation marks omitted); see also State v. Cardin, 987 A.2d 248, 250 (R.I. 2010). When this Court considers the denial of a motion for judgment of acquittal, "[t]he standard of review is not that of abuse of discretion, but rather whether the trial justice was correct as a matter of law." State v. Rodriguez, 742 A.2d 728, 732 (R.I. 1999). As such, we proceed in a de novo manner. See Grady v. Narragansett

_____

[2] On February 10, 2012, defendant filed a motion in the Superior Court for leave to file a notice of appeal out of time, which was granted.

Electric Co., 962 A.2d 34, 41 (R.I. 2009) ("In contrast to our deferential stance vis-à-vis factual findings made by a trial justice, we review in a de novo manner a trial justice's rulings concerning questions of law."); see also Waterman v. Caprio, 983 A.2d 841, 844 (R.I. 2009). In reviewing "a trial justice's denial of a motion for a judgment of acquittal, we employ the same standards as the trial court." State v. Robat, 49 A.3d 58, 71-72 (R.I. 2012) (internal quotation marks omitted); see also State v. Buchanan, 81 A.3d 1119, 1128 (R.I. 2014); State v. DeOliveira, 972 A.2d 653, 663 (R.I. 2009). That standard requires this Court to "view the evidence in the light most favorable to the prosecution, giving full credibility to its witnesses, and drawing all reasonable inferences consistent with guilt." State v. Diaz, 46 A.3d 849, 860 (R.I. 2012) (internal quotation marks omitted); see also State v. Whitaker, 79 A.3d 795, 809 (R.I. 2013); State v. Pitts, 990 A.2d 185, 189 (R.I. 2010). Then, if that examination "reveals evidence sufficient to warrant a jury verdict of guilt beyond a reasonable doubt, the trial justice's decision should be upheld." Lopez, 78 A.3d at 781; State v. Brown, 9 A.3d 1232, 1237 (R.I. 2010); State v. Mondesir, 891 A.2d 856, 861 (R.I. 2006).

The defendant supports his argument that the trial justice erred in denying his motion for a judgment of acquittal by emphasizing: (1) that not one of the state troopers at the scene, other than Trooper Pereira, saw defendant throw an object from the window of the SUV; (2) that Trooper Pereira could not identify the object that he alleged was thrown from the SUV by defendant as a gun; (3) that the discovery of the gun on the bridge abutment was insufficient to prove that it was the particular object that had been allegedly thrown from the SUV; and (4) that Trooper Pereira was unable to see the face of the individual who allegedly threw the object because he was positioned behind the SUV and based his conclusion that defendant had thrown the gun only on his belief that it was defendant who was the right rear passenger in the SUV.

- 11 -

We are not persuaded by defendant's arguments. This Court, like the trial justice, "is required to evaluate only that evidence that the prosecution claims is capable of supporting proof of guilt beyond a reasonable doubt." Lopez, 78 A.3d at 781 (internal quotation marks omitted); see also Cardin, 987 A.2d at 250. Drawing all inferences in favor of the state, we are convinced that the testimony of Troopers Pereira and Hernandez as well as that of Corporal Grassel was sufficient to support the conviction.

It was adduced at trial that Trooper Pereira saw an individual, later identified by him as defendant, who was seated in the right rear passenger's seat of the SUV, throw a "grayish metallic" object out of the window of the SUV; according to Trooper Pereira's testimony, the object went over the guardrail of the bridge. Trooper Hernandez corroborated Trooper Pereira's testimony that defendant was the right rear passenger in the SUV; and he stated that, when he inspected an abutment below the bridge and perpendicular to the passenger's side of the SUV, he observed a firearm. Although defendant notes that Ms. Leav's testimony with respect to the positions of the passengers in the car was contradictory to the testimony of Troopers Pereira and Hernandez, this Court has stated that we "[do] not pass upon the credibility of witnesses in determining whether a judgment of acquittal was warranted." State v. Long, 61 A.3d 439, 446 (R.I. 2013); see also State v. Heredia, 10 A.3d 443, 446 (R.I. 2010) (stating that, in reviewing a trial justice's denial of a motion for judgment of acquittal, "we must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt") (internal quotation marks omitted). Corporal Grassel additionally testified that the only items he observed on the abutment were a firearm and a glass bottle; and he added that the glass bottle had "a layer of soot or sand on it" whereas the firearm was "relatively clean." When viewing this evidence in the light most

favorable to the state, we are satisfied that a logical and reasonable inference could be drawn that the handgun found on the abutment was the object that was thrown from the SUV and that it was thrown by defendant. Accordingly, it is our opinion that the state produced sufficient evidence from which a jury could infer beyond a reasonable doubt that defendant possessed the handgun.[3]

After a careful review of the evidence presented in the instant case and considering that evidence in the light most favorable to the state, giving full credibility to its witnesses and drawing all reasonable inferences consistent with defendant's guilt, it is clear to us, as it was to the trial justice, that there was more than sufficient evidence submitted at trial to support a verdict of guilty beyond a reasonable doubt. See Lopez, 78 A.3d at 781; State v. Rolon, 45 A.3d 518, 524-25 (R.I. 2012); State v. Cipriano, 21 A.3d 408, 421-22 (R.I. 2011). Accordingly, the trial justice did not err when he denied defendant's motion for a judgment of acquittal.

**B**

**Defense Counsel's Closing Argument**

The defendant's second argument on appeal is that he is entitled to a new trial because, in his view, the trial justice "violated his right to assistance of counsel under the United States and Rhode Island constitutions by improperly restricting defense counsel's closing argument." The defendant focuses on two points in the closing argument as to each of which he contends that there was an improper restriction on defense counsel's argument. We shall address each in turn.

We have recognized that "final argument is a vital part of the assistance of counsel guaranteed by the Sixth Amendment to the Constitution of the United States * * * ." State v.

---

[3]  It will be recalled that it was stipulated during the course of trial that defendant did not have a license to possess a firearm on September 13, 2010 and that the firearm was operable on that date.

  The defendant had also stipulated prior to trial that he would "automatically be adjudged convicted" on Count Two if he was convicted on Count One.

Pemental, 434 A.2d 932, 937 (R.I. 1981); see Herring v. New York, 422 U.S. 853, 862 (1975)

("In a criminal trial, which is in the end basically a factfinding process, no aspect of such

advocacy could be more important than the opportunity finally to marshal the evidence for each

side before submission of the case to judgment."). It is well settled, however, "that the conduct

of a trial in the Superior Court is within the sound discretion of the trial justice." Barnes v.

Quality Beef Co., 425 A.2d 531, 534 (R.I. 1981). And, "[i]t is a long-standing rule of law that

the trial justice sitting in a jury trial may, in the exercise of his [or her] sound discretion, limit the

scope and extent of counsel's closing argument." Id. at 535; see also State v. Frost, 161 P.3d

361, 365 (Wash. 2007) (en banc) ("It is well established that trial courts possess broad

discretionary powers over the scope of counsel's closing arguments."). In State v. Ellis, 619

A.2d 418 (R.I. 1993), we expressly alluded to the broad discretion accorded to the trial justice

with respect to ensuring that closing argument "does not stray unduly from the mark, or

otherwise impede the fair and orderly conduct of the trial." Id. at 422 (internal quotation marks

omitted). The following passage from Ellis is directly relevant to the instant case:

> "This is not to say that closing arguments in a criminal case
> must be uncontrolled or even unrestrained. The presiding judge
> must be and is given great latitude in controlling the duration and
> limiting the scope of closing summations. * * * He may ensure that
> argument does not stray unduly from the mark, or otherwise
> impede the fair and orderly conduct of the trial. In all these
> respects he must have broad discretion." Id. (quoting Herring, 422
> U.S. at 862).

It is defendant's first contention that defense counsel, during the first objected-to portion

of the closing argument, was seeking to draw attention to the dearth of corroborative evidence

tying defendant to the handgun found below the bridge.[4] The defendant argues that the

---

[4] It will be recalled that the prosecutor interposed an objection after defense counsel had uttered the following two sentences: "There should be some corroboration of the facts of this

- 14 -

"rhetorical question regarding the wrongly convicted was in reference to the lack of evidence against [him] and was not an improper comment on sentencing," and he then contends that the trial justice erred "by sustaining the state's objection to this permissible comment on the dearth of direct evidence against [defendant]."

A review of the record, however, reveals that the trial justice did not sustain the state's objection to defense counsel's statement, nor did he strike that statement from the record. The trial justice instead admonished defendant that issues relating to punishment should not "continue to be part of [his] comments," and the trial justice referred to his explicit prior instruction to the jury that punishment "should never be considered by the jury in any way in arriving at an impartial verdict." It is worth noting that the entire colloquy took place in the presence of the jury; and, therefore, the jury heard defense counsel's clear argument regarding what he contended was a lack of corroborating evidence in the case at bar. In our judgment, the cautionary language of the trial justice with respect to defense counsel's mention of "people who are serving 20 years in jail" cannot be construed as a limitation on defendant's closing argument; it was simply a reminder to counsel that punishment was not a permissible topic. Accordingly, we see no merit in the first of defendant's contentions as to the violation of his right to the assistance of counsel.

The defendant's second contention in relation to the closing argument is that the trial justice improperly curtailed defense counsel's opportunity to present the case to the jury by sustaining the state's objection to defense counsel's statement "pointing out the undisputed fact that the gun had been in the custody of the Rhode Island State Police since the date of the alleged offense." Immediately after the colloquy with the court that we discussed in the preceding

case. How many times have you heard recently in the news people who are serving 20 years in jail for a rape or murder they didn't commit?" See Part I.F., supra.

- 15 -

paragraph, defense counsel proceeded to state in the presence of the jury: "The defense never had the opportunity to have that weapon fingerprinted. It was in the custody of the State Police." At that point, the prosecutor objected, which objection was sustained by the trial justice. It is defendant's argument on appeal that "[d]efense counsel was entitled to argue that[,] without fingerprints, Mr. Ferrer could not, unfortunately, be exonerated by scientific evidence" and that his assertion that the firearm had been in the custody of the police "tied in with defense counsel's argument that the state may have greatly reduced the likelihood of successful fingerprinting by waiting to test until six months after the gun was seized, test-fired, and repeatedly handled * * * ."

We do not find defendant's argument to be at all persuasive. We agree with the state's assertion in its written submission to this Court that defense counsel's statement tended to imply, misleadingly, to the jury that the state "had acted deliberately to violate [defendant's] rights." Nothing in the record indicates that defendant at any point sought to have a fingerprint test performed on the firearm or was prevented by the state from doing so. It was well within the trial justice's discretion to sustain the state's entirely proper objection in order to ensure that the closing argument did "not stray unduly from the mark." Ellis, 619 A.2d at 422 (quoting Herring, 422 U.S. at 862).

It is our definite opinion that no limitation on closing argument occurred at the time of the first objection and that the trial justice properly sustained the state's subsequent objection to defense counsel's statement with respect to the fingerprinting of the handgun. Accordingly, we are unable to perceive any basis for accepting the defendant's contention that the trial justice "violated his right to assistance of counsel under the United States and Rhode Island constitutions."

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The record in this case may be returned to that tribunal.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  State v. Rafael Ferrer.

**CASE NO:**  No. 2012-238-C.A.
       (P2/11-105AG)

**COURT:**  Supreme Court

**DATE OPINION FILED:** May 30, 2014

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty**,** Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice William P. Robinson III

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

    Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

    For State: Lauren S. Zurier
       Department of Attorney General

    For Defendant: Kara J. Maguire
       Office of the Public Defender