**STATE**

v.

**Nelson ROLON, alias John Doe.**

**No. 2009–193–C.A.**

Supreme Court of Rhode Island.

June 14, 2012.

Christopher R. Bush, Department of Attorney General, for State.

Catherine Gibran, Office of the Public Defender, Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

On August 27, 2007, an eighty-seven-year-old woman's purse was stolen in a

supermarket parking lot. As a result, the defendant, Nelson Rolon, was charged with, and ultimately convicted of, first-degree robbery. He now appeals his conviction to this Court, arguing that the trial justice erred in denying his motion for a judgment of acquittal because the evidence produced at trial was legally insufficient to prove the element of force.[1] For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

### Facts and Procedural History

On September 28, 2007, a grand jury indicted defendant for the first-degree robbery of Irene Joseph, an elderly person,[2] in violation of G.L.1956 § 11–39–1(a).[3] The defendant's trial took place in December 2008. The state did not present Ms. Joseph as a witness at the trial because, at that time, she was eighty-nine years old and confined to a nursing home. The state did, however, present six witnesses against defendant, the substance of whose testimonies we review below.

The first witness to testify was Lorraine Martin, an employee of the Stop & Shop on Smithfield Road in the Town of North Smithfield. At around one o'clock in the afternoon on August 27, 2007, Ms. Martin was eating lunch in her car in the Stop &

Shop parking lot when she heard a woman yelling: "[H]elp me. He stole my pocketbook. Stop him. Somebody help me." Ms. Martin testified that when she looked to her right, she saw a "[s]kinny, frail," elderly woman "go[ing] after" a man who was "jumping" into a vehicle. She then witnessed the man back the vehicle out of its parking spot, such that the elderly woman "had to jump out of the way, because he would have hit her." At that point, Ms. Martin testified, she decided that she "had to do something," so she pulled her car out of its parking spot, started following the vehicle, and called 911. She followed the vehicle for approximately five minutes, never losing sight of it, and eventually was able to see the vehicle's license plate as it was turning around in a cul-de-sac. Ms. Martin described the vehicle as "a silver SUV" with "stuff hanging from [its] rearview mirror," and she stated that the man driving the vehicle "had a baseball cap and sunglasses on." Ms. Martin was able to identify that same vehicle at the police station "[a] couple of days later," and, at trial, she identified a photograph of a silver SUV with the license plate number ZN–990 as a photograph of the vehicle that she was following on August 27, 2007.

Loida Figueroa, who identified herself

---

1. In his prebriefing statement to this Court, defendant additionally argued that the trial justice erred in denying his motions *in limine* to preclude the admission of two pieces of a purse strap, a knife, and the testimony of a witness concerning the victim's cries for help; he also argued that the trial justice erred in denying his motion for a new trial. Because defendant did not advance these arguments in his full brief to this Court, we deem them waived. *See* Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure ("Errors not claimed" in a full brief "ordinarily will be treated as waived and not be considered by the Court.").

2. " 'Elderly person' means a person sixty (60) years of age or older." G.L.1956 § 11–39–1(c)(2).

3. Section 11–39–1(a) states:

   "Every person who shall commit: (1) robbery by use of a dangerous weapon; (2) robbery where a victim is injured; or (3) robbery where the victim is a person who is severely impaired or an elderly person; shall be guilty of first degree robbery and shall be imprisoned for not less than ten (10) years and may be imprisoned for life, or fined not more than fifteen thousand dollars ($15,000), or both."

as defendant's wife,[4] also testified at his trial. She testified that "[a]t lunchtime" on August 27, 2007, defendant visited her at her place of employment—"the Wal–Mart in [the City of] Woonsocket." Ms. Figueroa stated that she and defendant had lunch together and that defendant then left between 1 and 1:30 p.m. According to Ms. Figueroa, when defendant visited her that day, he was driving her vehicle—a Hyundai Santa Fe with the license plate number ZN–990.

Melanie Ruiz, who has a child with defendant, was the third witness to testify at his trial. Ms. Ruiz testified that at around 1:30 p.m. on August 27, 2007, defendant called her, told her that "somebody was chasing him," and asked her to pick him up at a hotel near the Lincoln Mall in the Town of Lincoln. When Ms. Ruiz arrived at that location, she observed defendant standing behind the hotel and the vehicle that Ms. Ruiz knew defendant to drive— Ms. Figueroa's Hyundai Santa Fe—parked at a gas station next to the hotel. The defendant and Ms. Ruiz then drove in Ms. Ruiz's car to Cold Spring Park in Woonsocket, where they spent about an hour, and they then drove around the Town of Uxbridge, Massachusetts. At around six o'clock in the evening, Ms. Ruiz dropped defendant off "at the casino in Lincoln"; at around 6:45 p.m., however, defendant called her and asked her to pick him up from there. Ms. Ruiz testified that after she picked him up, defendant offered to put gas in her car, so they stopped at a Shell gas station in Lincoln. According to Ms. Ruiz, defendant paid for the gas,

which cost "about $30," with a credit card.[5] Ms. Ruiz then dropped defendant off at his car, which was still at the gas station next to the hotel near the Lincoln Mall.

Ms. Ruiz also testified that at some point while she was with defendant on August 27, 2007, he gave her a plastic bag and "told [her] to hold it for him for a day or two" and not to "leave it in the car." Ms. Ruiz kept the bag in a closet in her house, but she gave it to the police the next day. She testified that she did not add or remove anything from the bag while it was in her possession, and that she believed it to contain "a hat, sunglasses, and a shirt." The bag was admitted into evidence as a full exhibit; when asked by the state to look at the contents of the bag, Ms. Ruiz did so, noting that the bag contained a hat, sunglasses, a shirt, and a knife.

Finally, Ms. Ruiz testified that when the police questioned her on August 28, 2007, concerning the previous day's events, she initially lied and told them that she was with defendant "for the whole day." According to Ms. Ruiz, she did this because defendant had "told [her] to tell [the police] that he was with [her] the whole day." She further testified, however, that she eventually told the police the truth—that the first time she saw defendant on August 27, 2007, was after he telephoned her at 1:30 p.m. and asked her to pick him up.

Russell Amato, a patrolman in the North Smithfield Police Department, testified that by the time he arrived at work for his 4 p.m.-to-midnight shift on August 27, 2007, a search already was underway for

---

**4.** Ms. Figueroa admitted that she and defendant were not legally married, but she stated that they had been together for fifteen years and that she considered defendant to be her husband.

**5.** Ms. Ruiz testified that she found defendant's use of a credit card "weird" because "[h]e usually doesn't have any cards." Later at trial, a credit card statement for Ms. Joseph's Sears Gold MasterCard was entered as a full exhibit. The statement showed a $30.87 transaction that took place on August 27, 2007, at a Shell gas station in the Town of Smithfield.

"a silver Hyundai with Rhode Island registration ZN–990." Patrolman Amato stated that "an address in Woonsocket belonging to that registration was checked, and officers did head out to that location" and asked the tenant to contact them, should the vehicle arrive there. Later during his shift, Ptlm. Amato received a telephone call informing him that the silver Hyundai at issue had arrived at that Woonsocket address. Patrolman Amato headed to that location and spoke to Ms. Figueroa, who identified herself as the owner of the vehicle, as well as to defendant. According to Ptlm. Amato, both Ms. Figueroa and defendant told him that defendant had been driving the vehicle earlier that day.

Patrolman Amato further testified that when he asked defendant to accompany him "voluntarily, on his own free will," to the police station and answer some questions about "his whereabouts for that day," defendant said that he was "more than happy" to do so. At the police station, defendant signed a rights form and answered Ptlm. Amato's questions. Specifically, Ptlm. Amato testified, defendant told him that he met up with Ms. Ruiz between 10:15 and 10:30 a.m. at a gas station in Lincoln, that he left the Hyundai that he had been driving there, and that he and Ms. Ruiz then drove in Ms. Ruiz's car "to a mall in Massachusetts." According to Ptlm. Amato, defendant also told him that he locked his vehicle and took the only set of keys to the vehicle with him. Finally, Ptlm. Amato stated, defendant said that he returned to his vehicle at around three o'clock in the afternoon.

Glenn Lamoureux, a sergeant in the North Smithfield Police Department,[6] testified next at defendant's trial. He testified that on August 27, 2007, he responded to the Stop & Shop on Smithfield Road after receiving "a call from dispatch to respond to that location for a robbery that had just taken place." Upon arrival, Sgt. Lamoureux learned that a "purse snatching" had occurred in the parking lot. He then took photographs of the "immediate area" where the snatching occurred and "attempted to locate some evidence." Sergeant Lamoureux located a piece of a "black leather strap" that "[a]ppeared to be from a purse" in the same area of the parking lot; he also retrieved another piece of a purse strap that, he testified, Ms. Joseph had been "clutch[ing] in her hand." Both strap pieces were entered into evidence as full exhibits. According to Sgt. Lamoureux, when he spoke to Ms. Joseph, "[s]he was visibly shaken," and he "could tell she was nervous because of what had taken place."

Sergeant Lamoureux further testified that the next day, August 28, 2007, he contacted Ms. Figueroa to obtain her consent to search her Hyundai, which, by that point, already had been impounded by the police. Ms. Figueroa agreed to come to the police station to speak with Sgt. Lamoureux; while there, according to Sgt. Lamoureux, she told him that she had lunch with defendant between noon and 1 p.m. the previous day. Sergeant Lamoureux noted that this conflicted with defendant's story that he had been with Ms. Ruiz "between 10:30 [a.m.] and 3:30 p.m." As a result, he contacted Ms. Ruiz for a statement. Sergeant Lamoureux testified that Ms. Ruiz's story also conflicted with what Ms. Figueroa had told him, and that when he confronted Ms. Ruiz with this inconsistency, "[s]he became nervous, and she said that [defendant] had told her to lie about the times that they were together on [August 27, 2007]." According to Sgt. Lamoureux, Ms. Ruiz eventually told him that she saw defendant "a little after 1:30"

6. At the time of the events in question, Sgt.     Lamoureux held the rank of patrolman.

p.m. on August 27, 2007, and that when he called her that day, "he seemed panicked" and had "claimed that somebody was chasing or following him."

Finally, Sgt. Lamoureux testified that later in the day on August 28, 2007, he called defendant and asked him to come to the police station "for an additional statement." At the station, after being advised of his rights, defendant denied meeting Ms. Figueroa for lunch the previous day, asking Ms. Ruiz to lie to the police, or giving her a bag to hide. At one point, according to Sgt. Lamoureux, defendant said "[']I'm guilty of this,['] and then immediately said, [']but I didn't do this.[']" Sergeant Lamoureux testified that defendant also asked "about the victim and how old she was, and if he would be able to see the victim." Sergeant Lamoureux stated that defendant then asked to make a telephone call and "apparently dialed or called somebody, but never had a conversation." The defendant then, according to Sgt. Lamoureux, "stood up out of his chair" and said: "I'll take you to where the purse is." He led the police to two dumpsters located behind the Courtyard Marriott on Route 116 in Lincoln and told them that the purse was inside one of the dumpsters. Both dumpsters were searched, but no purse was found.[7]

Sharon Pagliarini, a detective in the North Smithfield Police Department, was the last witness to testify at defendant's trial; she testified about the bag that was obtained from Ms. Ruiz's closet. Detective Pagliarini identified the bag and its contents, stating that all of the items in the bag—a T-shirt, a "white hat," sunglasses, and "a knife with the description [*sic*] of Nelson"—were "in the same or substantially the same condition as [when she] found them in the closet of [Ms.] Ruiz's house."

After the state rested, defendant indicated that he would not call any witnesses and moved for a judgment of acquittal. In so moving, defendant argued that "even drawing every inference favorable to guilt in the light most favorable to the [s]tate, a jury still could not find beyond reasonable doubt that the element * * * [of] force * * * has been met in this case." The defendant suggested that because there was no testimony at trial with respect to the actual interaction between defendant and Ms. Joseph at the moment the purse was stolen, the purse very well could have been "caught in the handles of a carriage and the strap cut free," with Ms. Joseph being on the other side of her car. The defendant admitted that such circumstances would be enough to convict him of larceny, but he asserted that they would be insufficient to convict him of robbery— a crime that requires a finding that the taking of goods was "by violence or by putting the victim in fear." The defendant argued that to make such a finding, the jury would have to make "an assumption"—"pass[ing] into the realm of speculation"—and that simply would not be sufficient to sustain the requisite burden of proof.

The state, in response, agreed that the element of force is essential to the crime of robbery, but it argued that it had presented sufficient evidence of force in this case. Specifically, the state pointed to the physical evidence in this case: the knife found in the plastic bag that defendant had asked Ms. Ruiz to hold on to and the two pieces of the purse strap, one found in the Stop & Shop parking lot and the other recovered from Ms. Joseph. The state asserted that an inference could be drawn from those pieces of evidence "that [the] straps ha[d] been cut." The state also argued that the

---

7. One of the dumpsters had been emptied   earlier that day.

way the straps had been cut shows that defendant took the purse "by force with that knife cutting those straps away from [Ms.] Joseph." [8]

In ruling on defendant's motion for a judgment of acquittal, the trial justice first set forth the standard by which such a motion is judged. He then stated that the evidence presented at trial, "when viewed in the light most favorable to the [s]tate, and when reasonable inferences are drawn therefrom," was sufficient to allow the jury to find beyond a reasonable doubt that defendant had a knife, that he cut Ms. Joseph's purse with the knife, and that he thereby took her purse "by force, violence, or intimidation." The trial justice also stated that Ms. Joseph's age, her plea for help immediately after her purse was snatched, and her "nervous" state after the incident, as testified to by Sgt. Lamoureux, further supported the inference that she was placed in fear at the time of the theft. Ultimately, the trial justice denied defendant's motion for a judgment of acquittal.

■ The jury found defendant guilty of first-degree robbery. Thereafter, defendant filed a motion for a new trial, which the trial justice denied on December 17, 2008. On February 25, 2009, defendant was sentenced to twenty-five years at the Adult Correctional Institutions, with twelve years to serve and the remainder suspended, with probation. He appealed on March 5, 2009, and a judgment of conviction and commitment was entered thereafter.[9]

## II

### Standard of Review

■ In reviewing the denial of a motion for a judgment of acquittal, "we apply the same standard as that applied by the trial justice; namely, we 'must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt.'" *State v. Caba*, 887 A.2d 370, 372 (R.I.2005) (quoting *State v. Higham*, 865 A.2d 1040, 1048 (R.I.2004)). "If the totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for [a] judgment of acquittal must be denied." *State v. Snow*, 670 A.2d 239, 243 (R.I. 1996).

## III

### Discussion

On appeal, defendant argues that the trial justice erred in denying his motion for a judgment of acquittal because the evidence presented at trial "was legally insufficient to prove the element of force as is required for robbery." According to defendant, the state did not present any evidence "to suggest that force greater than the amount needed to effectuate the taking of the handbag was employed," nor, he argues, was any evidence presented that Ms. Joseph "was intimidated or put in fear while the taking occurred." The defendant concedes that "[a]t best, the state's case merely amounted to proof of larceny from the person."

■ Although § 11–39–1 sets forth the penalties for the different degrees of robbery, it does not define the elements of

---

8. The state noted that the piece of strap retrieved from Ms. Joseph "has a slice mark about an inch above the cut that was made."

9. "Although defendant's notice of appeal was premature, it was nevertheless valid." *State v. Chase*, 9 A.3d 1248, 1252 n. 2 (R.I.2010); *see also Otero v. State*, 996 A.2d 667, 670 n. 3 (R.I.2010).

that crime. Consequently, we long have held that § 11–39–1 incorporates the common-law definition of robbery, that definition being the "felonious and forcible taking from the person of another of goods or money [of] any value by violence or [by] putting [the victim] in fear." *State v. Robertson*, 740 A.2d 330, 333 (R.I.1999) (quoting *State v. Reposa*, 99 R.I. 147, 149, 206 A.2d 213, 215 (1965)). "A required element of robbery is that 'the taking be accomplished by force, violence, or intimidation.' " *Id.* (quoting *State v. Froais*, 653 A.2d 735, 738 (R.I.1995)). It is the additional element of force, violence, or intimidation in the taking of property that differentiates robbery from larceny; thus, "[l]arceny is a lesser included offense of robbery." *State v. Briggs*, 787 A.2d 479, 487 (R.I.2001).

In *Robertson*, 740 A.2d at 333–34, this Court adopted the rule that "a snatching involves sufficient force to support a conviction of robbery if the article taken is so attached to the person or the clothes of the victim as to afford resistance." In so doing, we noted that "[r]obbery is punished more severely than larceny because the crime presents the risk of harm to the person of the victim and not solely to the victim's property," and that this "risk of bodily injury * * * is present when the item that is being snatched is attached to the body or the clothing of the victim." *Id.* at 334. It bears repeating that "the force used in a robbery 'makes the violation of the person more atrocious than privately stealing.' " *Id.* (quoting 4 William Blackstone, *Commentaries* *242).

▪ Because defendant's sole contention on appeal is that the state presented insufficient evidence of force, we review only that evidence from which a jury could have inferred that defendant used force in stealing Ms. Joseph's purse. At defendant's trial, the following pieces of physical evidence were admitted as full exhibits: (1) two pieces of a purse strap with cut and slice marks on them, one that was found at the scene of the crime and another that the victim, Ms. Joseph, had been "clutch[ing] in her hand"; and (2) a plastic bag containing, among other things, a knife "with the description [*sic*] of Nelson," which defendant asked Ms. Ruiz to hide for him. When viewing this evidence in the light most favorable to the state, a reasonable inference could be drawn that defendant had a knife at the time that he took Ms. Joseph's purse and, further, that he used that knife to cut the straps of her purse to effectuate the taking.

We do not agree with defendant's assertion that the evidence presented does not "suggest that force greater than the amount needed to effectuate the taking of the handbag was employed." The record indicates that, not only were the two strap pieces cut, but there also are slice marks on the straps. The presence of these marks counters defendant's claim that "the purse was taken swiftly and by stealth" because it suggests that a struggle for the purse ensued. Consequently, we are of the opinion that a reasonable inference could be drawn that at the time when defendant took the purse from Ms. Joseph, she was aware of the taking and resisted it, or, at the very least, the purse was "so attached" to her "as to afford resistance." *Robertson*, 740 A.2d at 333. Therefore, we are satisfied that the state produced sufficient evidence from which a jury could infer beyond a reasonable doubt that defendant used force to take Ms. Joseph's purse.

Upon our review of the record in the light most favorable to the state, drawing all reasonable inferences consistent with guilt, we are satisfied that sufficient evidence existed that would justify a reasonable juror in finding that the defendant

robbed Ms. Joseph on August 27, 2007. For this reason, we affirm the trial justice's denial of the defendant's motion for a judgment of acquittal.

## IV

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record of this case shall be remanded to the Superior Court.

Justice FLAHERTY, dissenting.

I respectfully dissent from the holding of the majority in this case. After reviewing the record, the law of this state, and other relevant legal authorities, it is my opinion that the trial justice erred when he denied the defendant's motion for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure because the state failed to introduce evidence that the defendant used more force than was necessary to remove the purse from Ms. Joseph. The weight of authority, as well as common sense, leads me to the conclusion that the evidence suggesting that the defendant took Ms. Joseph's purse by cutting its straps, without more, and even in light of the generous Rule 29 standard, did not constitute evidence of the kind of force or fear that is necessary to establish the crime of robbery.

Our well-settled law defines robbery as "the felonious taking of money or goods of any value from the person of another, or in his presence, against his will, by violence, or putting him in fear." *State v. Brown*, 9 A.3d 1232, 1237 (R.I.2010) (quoting *State v. Rodriquez*, 731 A.2d 726, 729 (R.I.1999) (emphasis omitted)); *see also State v. Robertson*, 740 A.2d 330, 333 (R.I.1999). Indeed, we have said that "[t]he gist of the crime of robbery is the taking by force and

fear." *State v. Domanski*, 57 R.I. 500, 501, 190 A. 854, 855 (1937). As noted by defendant, scores of pages in legal reporters are devoted to the details of purse-snatching cases; this appears to reflect how the crime of purse snatching, and its relationship to robbery, has proven to be somewhat vexatious to courts around the country. *Compare, e.g., Owens v. State*, 787 So.2d 143, 143–44 (Fla.Dist.Ct.App.2001) (holding purse snatching that left a mark on victim's shoulder from purse strap not a robbery); *West v. State*, 312 Md. 197, 539 A.2d 231, 235 (1988) (holding purse snatched from woman's hand not a robbery); *State v. Curley*, 123 N.M. 295, 939 P.2d 1103, 1107 (Ct.App.1997) (holding that, although victim felt a shove on her shoulder, the purse snatching was not necessarily robbery) *with Wash v. State*, 408 N.E.2d 634, 637 (Ind.Ct.App.1980) (holding evidence of violence or force sufficient when the defendant assaulted victim and took her purse while fleeing her apartment); *State v. Johnson*, 411 So.2d 439, 441 (La.1982) (holding the defendant's taking of a purse dropped by a woman who fought him as he beat and attempted to rob the woman's female companion was properly found to be theft by use of force or intimidation). Nevertheless, it is fair to say that most jurisdictions consider "purse snatching" to be distinct from robbery.

After considering both the law of our state and other legal authorities, in my opinion, robbery is distinguished from larceny or "purse snatching" because it is primarily a crime of physical violence against a person; it is the force or violence directed at the victim that promotes his or her submission to the theft that elevates the crime. *See* 77 C.J.S. *Robbery* § 18 (2006); 67 Am.Jur.2d *Robbery* §§ 21, 29 (2003); *see also State v. Froais*, 653 A.2d 735, 738 (R.I.1995) (distinguishing "robbery" from "larceny"); *Winn v. Commonwealth*, 21 Va.App. 179, 462 S.E.2d 911,

912 (1995) ("[T]he offense of robbery * * * is not related to the force used on the object taken but to the force or intimidation *directed at the person of the victim*"). It is precisely this sentiment that led Blackstone to observe that robbery is "more atrocious than privately stealing," 4 William Blackstone, *Commentaries* * 242, which the majority rightly notes.

Under the circumstances of this case, it is beyond peradventure that the state was required to establish that defendant took Ms. Joseph's purse by force or fear to prove the crime of robbery. *See Rodriquez*, 731 A.2d at 729. In my opinion, the record is clear that there was utterly no evidence that Ms. Joseph was in fear, or even that she was aware that her purse was being stolen at the precise moment that the crime occurred. As the majority relates, Ms. Joseph was in a nursing home at the time of trial and was unable to testify, but her out-of-court statement to an independent witness that a man "stole her pocketbook" was admitted. Her statement, however, does not reasonably reflect that she was afraid at the time her purse was taken. The same is true of her demeanor after the crime took place. Indeed, although not central to a Rule 29 analysis, the fact that the intrepid Ms. Joseph actually chased the thief into the parking lot of the restaurant undercuts any suggestion that she was relieved of her purse by means of fear or intimidation.

Because the state introduced no evidence of fear, it necessarily must have relied on the theory that defendant accomplished the theft by force. To that end, I disagree with the majority's conclusion that force or violence against the person reasonably can be inferred by a finder of fact when the only evidence introduced was that of force against the property, at least under the circumstances before us here. The majority rests its conclusion on

three factors: (1) the cut purse straps; (2) the defendant's knife, which was presumably used to cut the straps; and (3) what the majority has determined—without citation to testimony or evidentiary support in the record beyond the exhibit itself—are additional "slice marks" on the strap segments that suggest that a "struggle for the purse ensued." The fact that the thief cut the straps is evidence of force directed at the property. However, the record is bereft of evidence that any force or violence was brought to bear on Ms. Joseph in an attempt to obtain the purse. Again, there were no eyewitnesses to the theft, and Ms. Joseph's statement sheds no light on the use of force or violence against her person.

With all due respect to the majority, the state presented no evidence suggesting that the knife ever was brandished before Ms. Joseph, or that any "struggle" occurred between defendant and Ms. Joseph whatsoever. These are speculative assertions that have no foundation in fact, and this Court has firmly held that a conviction may not rest on conjecture and surmise. *See In re Derek*, 448 A.2d 765, 768 (R.I. 1982); *Carnevale v. Smith*, 122 R.I. 218, 225, 404 A.2d 836, 841 (1979); *Waldman v. Shipyard Marina, Inc.*, 102 R.I. 366, 373–74, 230 A.2d 841, 845 (1967). Moreover, the facts here are remote from those that confronted this Court in *Robertson*, 740 A.2d at 332. In that case, the state introduced evidence that a defendant made the victim feel "nervous" by asking him questions; the defendant then unexpectedly reached into the victim's car and ripped two gold chains from his neck. *Id.* I have no quarrel with the holding of the Court in that case that "a snatching involves sufficient force to support a conviction of robbery if the article taken is so attached to the person or the clothes of the victim as to afford resistance." *Id.* at 333. In *Robertson*, however, there was evidence that the chains were clasped around the vic-

tim's neck and had to be torn off, which necessarily implies a significant degree of force against the person. *See id.* at 332. Also, in that case the defendant was face-to-face with his victim, and he placed his hands on his victim's person while relieving him of his necklace. *See id.* Here, there is simply no evidence in the record suggesting that the snatching itself was so violent that it necessarily implied the use of force or fear against Ms. Joseph's person.

I need not gild the lily: in my opinion, under these facts, the mere fact that the thief cut the straps of Ms. Joseph's purse does not lead to an inference that the defendant used more force than was necessary to remove the purse from her possession, or that any fear whatsoever was brought to bear upon her. Therefore, I respectfully dissent.