OPINION
Justice FLAHERTY,
for the Court.
Hurd Buick Pontiac GMC Truck, LLC, Hurd Buick Pontiac GMC Truck, LLC d/b/a Regine Pontiac GMC, and Hurd Chevrolet, Inc. (collectively Hurd or defendant), terminated the employment of Carmella Bucci, the plaintiff, when she was seventy-two years old. After it had hired the plaintiff twice at the age of sixty-seven for brief periods of employment, the defendant rehired Bucci, then aged sixty-eight, as a titles and registrations clerk. She then worked for a period of four years before Hurd terminated her for the final time. Bucci filed suit in Superior Court alleging, inter alia, that the defendant fired her due to unlawful age and disability discrimination in violation of G.L.1956 § 28-5-1, the Fair Employment Practices Act (FEPA). A justice of the Superior Court granted summary judgment to Hurd, and Bucci timely appealed to this Court. We are called upon to determine if the parties have met their burdens under the now familiar McDonnell-Douglas framework so that we may discern if summary judgment was appropriate. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.
I
Facts and Travel
The defendant hired Bucci on three different occasions, the first of which was as a part-time receptionist when Bucci was sixty-seven years old. That employment ended one month later because her services were no longer needed. In August 2001, Bucci was rehired, this time to work as the titles and registrations clerk. In this capacity, plaintiff was responsible for filing the necessary paperwork to transfer titles and registrations to the vehicles that defendant had purchased, sold, or leased. It was her task to resolve discrepancies, locate any missing documents, notarize titles, and send appropriate documentation to the various state registries of motor vehicles. At least once or twice per day, plaintiff interacted with customers in an effort to resolve issues pertaining to the registering of vehicles.
The defendant terminated Bucci’s employment in November 2001, after it received complaints from customers through Hurd’s finance and insurance and internet/e-mail departments. That, however, did not bring Bucci’s employment history with Hurd to an end. In August 2002, at the suggestion of one of her former supervisors at a different dealership, Hurd hired Bucci for the third time to again serve as the titles and registrations clerk. At that time, Bucci was sixty-eight years old.
At the beginning of her third employment period, defendant provided Bucci with its employee handbook, which stated *1166 in relevant part that “our employment-at-will policy permit[s] you or HURD AUTOMOTIVE to end our relationship for any reason at any time.” The handbook also says, “Neither the employee nor HURD AUTOMOTIVE is bound to continue the employment relationship if either chooses, at its will, to end the relationship at any time.” Notably, the handbook instructed employees “to refrain from any illegal, dishonest, or unethical conduct” and provided that failure to comply with Hurd’s “standard of business ethics and conduct could lead to disciplinary action, up to and including possible termination of employment.”
Finally, the handbook includes a “Progressive Discipline” section that outlines the manner in which the company will handle unsatisfactory conduct. However, and significantly, this section also cautions that Hurd may make use of that policy “at its discretion.” The disciplinary process described may include any of four steps: “verbal warning, written warning, suspension with or without pay, or termination of employment.” It provided that, although normally the steps would be followed in order, in some circumstances, including “extreme situations, termination of employment” may occur “without going through the usual progressive discipline steps.” Bucci acknowledged receipt of the handbook in 2004.
When she returned to Hurd Automotive, Bucci’s job responsibilities as the titles and registrations clerk were largely the same as before. She was required to complete and file the registrations and titles in a timely fashion for the vehicles that defendant sold, leased, or purchased. The record indicates that in 2005, defendant hired a new chief financial officer (CFO), a new office manager, and a new human resources director, all of whom either supervised or interacted with plaintiff. Unfortunately, some of the same performance issues that had bedeviled Bucci during her second stint of employment with Hurd began to surface. Although there had been one documented customer complaint about plaintiffs professionalism soon after she was rehired, indications of Bucci’s unsatisfactory performance began to increase.
In an affidavit in support of Hurd’s motion for summary judgment, office manager Alison Drake attested that Bucci was confrontational, lost paperwork, or provided incomplete paperwork to the various state motor vehicle departments and also that Drake had received complaints from employees in other departments about Bucci’s “failure to fulfill her job duties in a timely manner.” Another affiant, director of human resources, Connie Mandeville, attested that, on at least three occasions, she had received complaints from the Rhode Island Division of Motor Vehicles (DMV) about Bucci’s failure to forward proper registrations in a timely manner. CFO A1 Martin attested that he had personally observed plaintiffs poor attitude and that he was aware of customer complaints about delays in registration of vehicles that they had purchased or leased.
Also, Martin noticed that the titles and registrations department, over which he exercised oversight, was not as productive as similar departments in other dealerships at which he had been employed over the span of his forty-two-year career in the industry. He attested that, because that department did not generate activity reports outlining the current status of titles and registrations for vehicles sold by defendant, Hurd had difficulty tracking paperwork and responding to questions from customers or state registries. He also attested that, generally, the other titles and registrations departments at dealerships with which he had been associated performed additional duties, such as payroll *1167 processing. Martin discussed increasing productivity with Bucci, but he said that he found that she was generally unwilling to perform those responsibilities and that she resisted receiving training on the payroll computer system. By contrast, in Bueci’s deposition testimony, she asserted that Martin had asked her to do billing for wholesale vehicles. This, she said, she was willing to do because she had performed that type of work previously. However, Bucci further testified that her computer was limited to use for registrations, and, when it was programmed for the additional workload, a software conflict would crash the registrations program. Therefore, Bucci said, she required a second computer to perform the additional tasks, and she had not received it by the time of her termination. Nonetheless, Martin averred that Bucci failed to perform other tasks, such as generating activity reports, and that she had difficulty completing customers’ registrations and timely filing them with the appropriate state registries.[1]
It is also significant that, in early 2006, plaintiff experienced certain physical health problems. She began having pain in her left knee to the extent that she required a walker and that made walking up and down stairs difficult for her. Eventually, defendant arranged to move Bucci’s office from the second floor to the first so that she would be relieved of using the stairs. Bucci did not miss any time from work as a result of her knee pain. Also, in the summer of 2006, Bucci underwent cataract surgery, which required her to take medical leave for less than a week.
It is undisputed that, on the day before she underwent cataract surgery, Bucci forged two customer signatures to a letter sent to the Connecticut Department of Motor Vehicles (the department). After she had registered a vehicle for two customers who resided in Connecticut, plaintiff realized that the department had overcharged Hurd more than $900. Bucci learned from the department that the only way to have the overcharged amount refunded to defendant, rather than to the customers, was for the customers to send a letter to the department authorizing the change. Bucci testified at her deposition that, instead of waiting until after her surgery to resolve the issue, she drafted the letter, signed the customers’ names, and faxed it to the department. Several days later, the customers called Hurd to complain that their signatures had been forged. The customers also contacted the police, although no criminal charges were lodged against Buc-ci. As a result of this incident, on September 6, 2006, plaintiffs supervisor, Wendy Bowen, and Mandeville disciplined plaintiff by means of a written warning, which she acknowledged by signing. The warning also instructed plaintiff that she was “never to sign for a customer under [any] circumstances.” Mandeville testified that Martin and Bowen had considered discharging Bucci because of the forgery incident, but, on reflection, they had decided to give her another chance.
Approximately two months later, Martin terminated plaintiffs employment. Martin swore in his affidavit that, before the forgery incident, he had met with plaintiff on two occasions at which he communicated his expectations for her job performance. According to Martin, Bucci’s performance failed to improve after those meetings; she continued to be delinquent in returning customer phone calls, was rude to coworkers, and filed late or incomplete title and registration paperwork. Martin attested that in November 2006, after the forgery incident, he reviewed Bucci’s personnel file for the first time and discovered *1168 complaints filed against plaintiff dating from 2001. According to him, it was after this review that Martin discharged plaintiff. He maintained that he based his decision upon his personal observations of plaintiffs work performance, the forgery incident, his desire to obtain more productivity from the titles and registrations department, and plaintiffs unwillingness to perform these additional tasks. When she was deposed, Mandeville testified that Bucci had been fired for a variety of reasons, including the forgery and poor work performance before and after the forgery, coupled with the employer’s desire to rearrange positions in an effort to increase productivity.
The plaintiff argues in her brief to this Court that Martin could not have reviewed Bucci’s personnel file before he fired her because Mandeville testified when she was deposed that she kept all personnel files locked away and Martin did not ask to review Bucci’s file until after she had been dismissed. When plaintiff inquired why Martin asked to review Bucci’s file after her dismissal, Mandeville responded that Martin had “wondered if anyone else had the trouble we had with her.”
After she was fired, plaintiff filed for unemployment benefits with the Department of Labor and Training (DLT). In response to a letter from DLT that requested the reason defendant had discharged plaintiff, Hurd filed an employee termination report indicating that Bucci had been let go because the employer was “rearranging people’s jobs.” Mandeville, who signed the report, stated in her deposition testimony that Martin and Bowen decided to not disclose the negative reasons for plaintiffs discharge because defendant did not “want to make anything hard for [Bucci]” but that it was “too bad she had so many complaints.” Mandeville testified that even though poor work performance is not a disqualifying event for the receipt of unemployment compensation benefits, she filed the report in that manner to ensure that Bucci could collect them.
The plaintiff filed charges of discrimination with the Rhode Island Commission for Human Rights (RICHR) on June 9, 2007.[2] After receiving a notice of right to sue from the RICHR on October 19, 2007, plaintiff filed a complaint in the Superior Court, alleging violations of FEPA, for discrimination based on age and disability. On February 4, 2011, after both sides had conducted discovery, Hurd filed a motion for summary judgment, alleging that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law.
After a hearing on April 12, 2011, the trial justice granted Hurd’s motion for summary judgment in its entirety. Employing the burden-shifting, three-step analytical framework outlined in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the trial justice assumed that plaintiff had satisfied the first step of this paradigm, the prima facie case, found that defendant had met step two, the burden of producing a legitimate nondiscriminatory purpose for Bucci’s termination, and then concluded that plaintiff had failed to meet her burden of presenting material evidence demonstrating that Hurd’s legitimate reasons were merely a pretext for discrimination. Specifically, the trial justice found that plaintiff “provide[d] no substantive or evidentiary rebuttal” of Hurd’s reasons for termination, including “poor work performance,” “ongoing customer and co-worker complaints, as well as a need to realize more productivity *1169 from the title and registration clerk position formerly held by plaintiff.” The plaintiff filed a timely appeal to this Court on April 27, 2011.
Before this Court, plaintiff presses arguments for her claims of both age and disability discrimination. In essence, she argues that (1) the trial justice erred in finding that defendant met its burden of producing a legitimate nondiscriminatory reason for plaintiffs dismissal; and (2) the trial justice erred in holding that plaintiff failed to demonstrate that those reasons were merely pretextual.
II
Standard of Review
“[T]his Court reviews a grant of summary judgment de novo.” Sullo v. Greenberg, 68 A.3d 404, 406 (R.I.2013) (quoting Sacco v. Cranston School Department, 53 A.3d 147, 149-50 (R.I.2012)). “Examining the case from the vantage point of the trial justice who passed on the motion for summary judgment, ‘[w]e view the evidence in the light most favorable to the nonmoving party, and if we conclude that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law [,] we will affirm the judgment.’” Id. at 406-07 (quoting Sacco, 53 A.3d at 150). “Although summary judgment is recognized as an extreme remedy, * * * to avoid summary judgment the burden is on the nonmoving party to produce competent evidence that ‘prove[s] the existence of a disputed issue of material fact [.]’ ” Id. at 407 (quoting Mutual Development Corp. v. Ward Fisher and Co., 47 A.3d 319, 323 (R.I.2012)). We previously have cautioned that “we will not hesitate to affirm a grant of summary judgment if the nonmoving party ‘fails to make a showing sufficient to establish the existence of an element essential to that party’s case * * *.’ ” Beauregard v. Gouin, 66 A.3d 489, 493 (R.I.2013) (quoting Lavoie v. North East Knitting, Inc., 918 A.2d 225, 228 (R.I.2007)). Further, a factual dispute alone will not defeat a motion for summary judgment, “the requirement is that there be no genuine issue of material fact.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
Ill
Discussion
The Fair Employment Practices Act prohibits an employer from discharging an employee on the basis of age and disability. See § 28 — 5—7(l)(i). “This Court has adopted the federal legal framework to provide structure to our state employment discrimination statutes.” Neri v. Ross-Simons, Inc., 897 A.2d 42, 48 (R.I.2006) (citing Newport Shipyard, Inc. v. Rhode Island Commission for Human Rights, 484 A.2d 893, 898 (R.I.1984)). Because plaintiff claims employment discrimination, we will employ the now familiar three-part burden shifting framework as outlined by the United States Supreme Court in McDonnell-Douglas Corp., 411 U.S. at 802-04, 93 S.Ct. 1817. See McGarry v. Pielech, 47 A.3d 271, 280 (R.I.2012) (citing Center For Behavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680, 685 (R.I.1998)).
A
Disability Discrimination
Before we address the merits of plaintiffs arguments on disability discrimination, we must first direct our attention to whether her appeal is ripe for our consideration. Although plaintiff states in her brief that she is appealing the trial justice’s grant of summary judgment with respect to her claim of disability discrimi *1170 nation, she does not further develop this argument in her brief. We are, therefore, unable to consider it. Generally, we will consider an issue to be waived when a party “[sjimply stat[es] an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues * * State v. Chase, 9 A.3d 1248, 1256 (R.I.2010) (quoting Wilkinson v. State Crime Laboratory Commission, 788 A.2d 1129, 1131 n. 1 (R.I.2002)). Accord State v. Rolon, 45 A.3d 518, 519 n. 1 (R.I.2012) (finding arguments not advanced in full brief to Supreme Court to be waived). In its amicus curiae brief, the RICHR fashions a disability discrimination claim; however, we will not consider arguments that have been made by an amicus curiae but that were not advanced by a party. See Lane v. First National Bank of Boston, 871 F.2d 166, 175 (1st Cir.1989) (“We know of no authority which allows an amicus to interject into a case issues which the litigants, whatever their reasons might be, have chosen to ignore.”). Therefore, we confine our discussion to plaintiffs arguments with respect to her age-discrimination claim.
B
Age Discrimination
1
Prima Facie Case
In the first step of the McDonnell-Douglas paradigm, plaintiff must make out a prima facie case of age discrimination. Neri, 897 A.2d at 48-49. To meet this burden in cases of age discrimination, plaintiff must demonstrate that
“(1) she was at least forty years of age; (2) her job performance met the employer’s legitimate expectations; (3) the employer subjected her to an adverse employment action (e.g., an actual or constructive discharge); and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged.” Id. at 49 (quoting Ramirez Rodriguez v. Boehringer Ingelheim Pharmac [eu ]ti-cals, Inc., 425 F.3d 67, 78 n. 11 (1st Cir.2005)).
If a plaintiff is able to establish these elements, a presumption arises that the employer engaged in unlawful discrimination. Barros, 710 A.2d at 685 (citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).
However, before we may consider the elements of a plaintiffs prima facie case, we pause to discuss whether plaintiff has properly brought this matter before the Court. In her brief to this Court, Bucci does not appear to present arguments to demonstrate that she had satisfied her burden to establish a prima facie claim. Instead, Bucci relies upon the trial justice’s assumption that Bucci had made a successful prima facie claim without establishing it, and she directs us to the memorandum she filed objecting to defendant’s motion for summary judgment, “[t]o the extent this Court decides to review [the prima facie claim] de novo [.]”[3] Article I, Rule 16(a) of the Supreme Court Rules of Appellate Procedure states that “[e]rrors not claimed, questions not raised and points not made ordinarily will be treated as waived and not be considered by the Court.” As discussed above, we generally will consider an issue waived that is not raised by the appellant. Chase, 9 A.3d at 1256.
*1171 It is also true, however, that the trial justice assumed, without deciding, an element of a claim in a summary judgment proceeding, which we have held is “consistent with the summary judgment standard of viewing all facts in the light most favorable to the non-moving party, here, [the] plaintiff.” See Daniels v. Fluette, 64 A.3d 302, 305 (R.I.2013). We consistently have agreed with the United States Supreme Court that a plaintiffs burden to establish a prima facie ease of discrimination is “not especially onerous.” See Barros, 710 A.2d at 685; see also St. Mary’s Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (holding the plaintiff satisfies the burden of a prima facie case by a preponderance of the evidence); McGarry, 47 A.3d at 280. In Daniels, 64 A.3d at 305, the trial justice assumed an element, and we adopted that approach. Thus, we will give plaintiff the benefit of the doubt and assume without deciding that she has established a prima facie case, thereby satisfying the first step of McDonnell-Douglas.[4]
2
Legitimate Nondiscriminatory Reason
Under the McDonnell-Douglas framework, after plaintiff establishes her prima facie case, the burden shifts to defendant to come forward with legitimate nondiscriminatory reasons for the employee’s termination. Neri, 897 A.2d at 49 (citing Barros, 710 A.2d at 685). The defendant’s burden is one of production, not persuasion. Id. (citing Casey v. Town of Portsmouth, 861 A.2d 1032, 1037 (R.I.2004)). When a defendant offers such a reason, it “eliminates the presumption of discrimination created by the prima facie case.” Id. (citing Wellborn v. Spurwink/Rhode Island, 873 A.2d 884, 889 (R.I.2005)). To satisfy this burden of production, a defendant need only offer affidavits supporting the nondiscriminatory reason. Id. at 50.
The defendant articulated legitimate nondiscriminatory reasons for discharging plaintiff as follows: (1) plaintiff forged customers’ signatures on a letter submitted to a state agency; (2) plaintiff was unable or unwilling to perform additional responsibilities such as generating activity reports and payroll processing through defendant’s computer system; (3) plaintiff struggled to properly and timely complete customers’ registrations with appropriate state departments of motor vehicles; (4) defendant received complaints from customers and coworkers about plaintiffs poor work performance; (5) following the forgery incident, plaintiffs work performance did not improve, and she failed to take on additional responsibilities that Martin had requested of her. To *1172 support its assertions, defendant presented plaintiffs admission to the forgery in her deposition testimony, Mandeville’s deposition testimony, documented customer complaints, and affidavits from Martin, who fired Bucci, as well as Hurd’s office manager, Alison Drake, who attested to Bucci’s poor work performance and complaints that she received about Bucci from other Hurd employees.
On appeal, plaintiff sets forth a number of arguments attempting, without success in our opinion, to demonstrate that the trial justice erred when she found defendant failed to meet its burden of production.
First, plaintiff contends that defendant is precluded from relying on a reason that was not available to it at the time of the discharge, or that it did not consider at the time the termination was effectuated. In Martin’s 2011 affidavit, he swore that he made the decision to terminate Bucci after he had learned about complaints about her dating back to 2001 and that those complaints had been recorded in Bucci’s personnel file. However, Bucci points out that that assertion stands in stark contrast to Mandeville’s deposition testimony, in which Mandeville testified that no one had examined Bucci’s personnel file until after Martin had discharged her. This, she argues, is mendacious and demonstrates clearly that Hurd’s stated reasons for firing Bucci were merely pretextual. However, we are not persuaded because, even if Martin had not viewed Bucci’s personnel file at any time before he discharged her, Bucci does not dispute the other incidents that are set forth in Martin’s affidavits.[5] In those affidavits, Martin said that he had received complaints from coworkers about plaintiffs poor work performance and attitude and from customers who had complained about plaintiff. Martin further attested that he met with Bucci on at least two occasions with regard to his expectations of her, but that the meetings failed to result in any significant improvement in her performance because she continued to not return customers’ telephone calls, filed late or incomplete registrations, and declined to be trained on the payroll computer system to assist with payroll processing.
Second, Bucci cites to our decision in Casey, 861 A.2d at 1087 n. 2, in which we held that any legitimate nondiscriminatory reason must be admissible under the rules of evidence. See also Bur-dine, 450 U.S. at 255 and n. 9, 101 S.Ct. 1089. Bucci argues that to depend on customer complaints from 2001-02 is to rely upon hearsay upon hearsay because the complaints upon which defendant relied were vague and were from unidentified customers. We do not agree. The record indicates that defendant documented four complaints made against Bucci in 2001-02, three of which state the name of the complainant and specify the reason for the complaint. Moreover, even if we were to agree with Bucci that these complaints were rife with hearsay, Bucci nonetheless fails to dispute the affidavits and testimony of Hurd employees that they had received complaints from customers, motor vehicle departments, and coworkers in 2006, which appear to provide a more legitimate reason for termination than complaints from five years earlier.[6]
*1173 Finally, plaintiff maintains that defendant relied upon evidence that was too vague. Bucci urges that Mandeville could not provide the name of one complainant, or even describe in detail the nature of the complaints. In our opinion, this is not dispositive because Martin, Drake, and Bowen all swore to customer, coworker, and motor vehicle department complaints arising from Bucci’s job performance. Bucci has not challenged these averments on appeal.
Because defendant’s burden is limited to one of production, we are convinced that Hurd has provided legitimate nondiscriminatory reasons for discharging plaintiff.
3
Pretext
The final step articulated in McDonnell-Douglas Corp. shifts the burden back to the plaintiff to focus on “the ultimate question of ‘discrimination vel non.’ ” Neri, 897 A.2d at 50 (quoting Casey, 861 A.2d at 1037). To prove discrimination, a plaintiff need not provide a “smoking gun,” but rather must prove that “[the] defendants’ legitimate, nondiscriminatory reason for not hiring [her] was merely pretext (which would mean that the real reason for not hiring [the] plaintiff was unlawful animus).” Casey, 861 A.2d at 1038 (citing Barros, 710 A.2d at 685). The plaintiff may demonstrate pretext “either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer’s proffered explanation is unworthy of credence.” Barros, 710 A.2d at 685 (quoting Burdine, 450 U.S. at 256, 101 S.Ct. 1089). Further, “a plaintiffs prima facie case, combined with sufficient evidence to find that the employer’s asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.” Casey, 861 A.2d at 1038 (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The inference of discrimination is stronger if there is a “suspicion of mendacity” surrounding the reason for terminating the employee. Neri, 897 A.2d at 50 (quoting Barros, 710 A.2d at 685). However, the plaintiff has the burden of demonstrating not only that the offered reasons are false, but “that discrimination was the real reason.” McGarry, 47 A.3d at 281.
On appeal, plaintiff contends that the trial justice erred when she found that plaintiff had failed in her burden to demonstrate pretext. In that regard, the trial justice found that plaintiff had “fail[ed] to offer any valid rebuttal to the defendant’s alleged legitimate reason for her termination.” The plaintiff, in her efforts to convince us to vacate the judgment, unleashes a barrage of arguments to demonstrate the trial justice’s error. Because plaintiff offers no direct evidence of a discriminatory reason, she employs the indirect method to undermine defendant’s proffered reasons for discharge.
Primarily, Bucci argues that the trial justice erred because there was evidence of falsehood or mendacity. Specifically, Bucci contends that the affidavit of Martin, in which he swore that he fired Bucci after gleaning customer complaints from her personnel file, is an “undisputed lie” because Mandeville, the director of human resources, testified in her deposition that Martin did not even review the file until after Bucci was fired. Also, Bucci claims that Mandeville’s testimony that the DMV *1174 had made complaints about Bucci’s job performance was “unworthy of belief’ because a DMV employee who had interacted with Bucci attested that he had no recollection of making complaints about Bucci or having any problems with her job performance. As further evidence of pretext, Bucci contends that defendant deviated from its own personnel policies when it fired her. Bucci points out that, aside from the warning notice she received for the forgery incident, she received no other documented incident reports or warning notices, either prior to or after the forgery incident.
In this step of a McDonnell-Douglas analysis, we first must consider whether the purportedly legitimate, nondiscriminatory reasons for termination offered by the employer are tainted by this claimed “suspicion of mendacity.” Neri, 897 A.2d at 50 (quoting Barros, 710 A.2d at 685). In Barros, 710 A.2d at 686, we observed that the employer found the employee’s conduct to be objectionable only after she had announced that she was pregnant. That gave rise to a suspicion of mendacity, which, when combined with the employer’s failure to follow its personnel policies, was deemed to be sufficient to support a finding of unlawful gender discrimination. Id. We have noted that “Bar-ros stands for the proposition that evidence suggesting a meaningful ‘suspicion of mendacity” will greatly bolster a plaintiffs case.” Neri, 897 A.2d at 50. However, and without in any way retreating from our holding in Barros, we also echo the cautions described in Mesnick v. General Electric Co., 950 F.2d 816, 825 (1st Cir.1991), that “[c]ourts may not sit as super personnel departments, assessing the merits — or even the rationality — of employers’ nondiscriminatory business decisions.” Simply put, an employer may terminate an employee for any reason, good or bad, provided that “the decision to fire does not stem from the person’s age.” Freeman v. Package Machinery Co., 865 F.2d 1331, 1341 (1st Cir.1988).
We simply do not perceive a Barros -like event in the present case. Indeed, it would appear that the event that ultimately would serve as the harbinger for plaintiffs ultimate discharge was Hurd’s hiring of Martin as CFO in 2005. Martin seemingly had a higher, more stringent standard with which he wanted plaintiff to comply. It is true that there is some inconsistency between the testimony of Mandeville and the affidavit of Martin about the timing of Martin’s review of plaintiffs personnel file. However, a mere inconsistency, without more, does not give rise to a suspicion of mendacity. Bucci is correct when she argues that the facts should be construed in a light most favorable to her, but we do not agree that this standard demands that we consider the factual dispute as evidence of intentional falsehood. In a de novo review of a grant of summary judgment, we will make all reasonable inferences in favor of the non-moving party. Martin v. Marciano, 871 A.2d 911, 914-15 (R.I.2005). Because the record contains only the inconsistency between Martin’s affidavit and Mandeville’s deposition testimony and not some other evidence that would suggest that Martin had been untruthful in his affidavit, it would be inappropriate for this Court to conclude that Martin lied. Viewing the facts in the light most favorable to Bucci, it is certainly reasonable to conclude that Martin never reviewed plaintiffs personnel file before he discharged her. However, were we to agree with plaintiff that a party could defeat summary judgment whenever there is some non-material factual dispute, summary judgment would never be appropriate in these cases because the trial court would be required to assume that the *1175 moving party had lied, even though there may be other reasonable explanations for the discrepancy.[7]
Moreover, even assuming that Martin had not reviewed the personnel file before he fired Bucci, the 2001-02 complaints about Bucci’s performance were not the solitary evidence defendant presented to support the termination. Mandeville testified in her deposition that the forgery incident was one of the reasons for firing Bucci. It is also significant that Martin supervised plaintiffs department for more than a year, received complaints from coworkers about Bucci’s performance, and personally attested to her unwillingness to assume more responsibilities in her capacity as titles and registrations clerk.
The plaintiff also provided the affidavit of DMV employee Thomas San Bento to support her pretext argument; she argues that that affidavit demonstrates that Mandeville’s testimony regarding DMV complaints about Bucci is not worthy of belief. It is important to note, however, that San Bento said in his affidavit that he did not recall making any complaints about Bucci and that he found her to be “professional, efficient and competent.” But Mandeville never said that it had been San Bento who had made a complaint to her about Bucci. Indeed, other employees from the DMV, or employees from motor-vehicle departments from other states, may well have complained about Bucci’s performance. When a plaintiff attempts to counter a claim by an employer that it fired an employee for poor performance, it is simply not sufficient for a plaintiff to present evidence that her performance was satisfactory. See Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir.2010). The plaintiffs burden is to demonstrate that it was unlawful discrimination that motivated the dismissal, and not simply an employer’s erroneous belief or assessment about poor performance. Id. at 1267.
The plaintiff correctly asserts that Hurd did not follow its own employment-termination policies that are set forth in its employee handbook, and she relies upon Barros, 710 A.2d at 686, to support an argument that this too gives rise to a suspicion of mendacity. This argument is unpersuasive, however, because it is undisputed that her employment was designated as “at will” that could be terminated “with or without cause, at any time.” Hurd’s policy of progressive discipline does outline a system of escalating actions to address an employment deficiency, but it also reiterates, at the outset of the description of the policy, that employment is “at will” and that defendant “may use progressive discipline at its discretion.” On the other hand, the handbook in Barros, 710 A.2d at 686, did not grant discretion to the employer when pursuing employment termination. Even if defendant had the benefit of a larger paper trail detailing plaintiffs *1176 alleged performance deficiencies and if, as a result, defendant had made use of the progressive-discipline policy, its failure to do so does not constitute pretext when implementation of the policy is discretionary and plaintiff is an at-will employee. Cf. Morris v. City of Chillicothe, 512 F.3d 1013, 1020 (8th Cir.2008) (holding failure to follow progressive discipline policy does not constitute pretext when employer reserves right to fire at-will employees without notice); Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1120 (10th Cir.2007) (holding failure to follow progressive discipline does not demonstrate pretext when use of the policy is entirely discretionary); Fane v. Locke Reynolds, LLP, 480 F.3d 534, 541 (7th Cir.2007) (holding no pretext for not following progressive discipline where policy contemplated immediate termination for certain offenses).
Further, the policy states that there are some employee problems that would in “extreme situations” warrant immediate termination. Presumably, one such extreme situation could stem from an employee’s failure, by engaging in a forgery, to comply with Hurd’s standard of business ethics charging its employees to refrain from any dishonest or unethical conduct. Hurd’s handbook continues that violation of this standard “could lead to disciplinary action, up to and including possible termination of employment.” It is clear that plaintiff received a warning after the forgery, but defendant argues that the forgery was but a part of the mosaic leading to her termination; it was not the sole grounds for dismissal. Nevertheless, such an incident could surely be taken into consideration at the time the final decision about Bucci’s employment was made. However, it is important to consider that determining whether the employer properly or efficiently made use of its discretionary progressive-discipline policies is not the role for this Court. Rather, our role is to determine if the personnel action was motivated by discrimination due to age. To second-guess discretionary uses of personnel policies for at-will employees when there is a lack of evidence of age discrimination would place this Court in the role of a “super personnel department”; a role we decline to embrace.
The plaintiff next argues that there is an inconsistency between Martin’s affidavit, in which he swore that Bucci was unwilling to take on certain additional tasks, and Bucci’s deposition testimony, in which she indicated that she was willing, but computer problems stymied her ability to do so. On appeal, Bucci claims that, after she informed Martin that she required two computers to begin the payroll processing, Martin promised to provide her with a second computer but then failed to abide by his commitment. However, when we analyze Bucci’s deposition testimony, it is unclear that she actually informed Martin of the need for two computers, and there is no indication that Martin promised or even indicated to Bucci that he would provide her with a second computer. Even if we were to assume that Bucci’s version of events is accurate, she fails to address defendant’s affidavits that stated she was unwilling to receive training on Hurd’s payroll system and that she did not take on the other tasks that Martin requested of her, such as generating activity reports to track the status of pending registrations.[8]
Finally, in an effort to demonstrate pretext, Bucci takes aim at the *1177 forms defendant provided to DLT after her discharge, which were silent as to any negative reasons for plaintiffs termination. She points out that Mandeville, who filled out and filed the report, specified that “we are rearranging people’s jobs” as the reason for termination. The plaintiff contends that this inconsistency demonstrates that the real reason for her firing was her age. This argument also founders because the record reveals that Hurd’s consistent effort to achieve more productivity out of plaintiffs department was a reason for her termination. Further, Mandeville testified that Hurd often did not list negative reasons for termination out of a concern that doing so might jeopardize the former employee’s ability to collect unemployment. Specifically, Mandeville testified that she did not “want to make anything hard” for Bucci. Cf. Hux v. City of Newport News, Va., 451 F.3d 311, 315 (4th Cir.2006) (“Once an employer has provided a nondiscriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation’s validity, or by raising points that are wholly irrelevant to it.”).
Ultimately, after considering the pleadings and affidavits in a light most favorable to the plaintiff, it is our opinion that the plaintiff has been unable to cast any meaningful doubt that the defendant’s proffered reasons for termination were merely a cover-up for age discrimination. Arguably, Hurd did not handle this termination as nimbly as possible, but it is the plaintiffs burden to demonstrate that the true reason for discharge was unlawful discrimination, and she has not done so. Further, we are not persuaded that there are any genuine issues of material fact that would need to be decided by a jury. A reasonable juror could not infer age discrimination based on the presence of minor inconsistencies in testimony and the undisputed evidence of substandard performance. We have carefully considered each of the other arguments raised by the plaintiff, and we conclude that they are without merit. We hold that the motion justice properly entered summary judgment in favor of the defendant on both employment discrimination claims.
IV
Conclusion
For the foregoing reasons, we affirm the grant of summary judgment in favor of the defendant. The record shall be remanded to the Superior Court.

. Of particular note, plaintiff chose not to depose Martin.

. We thank the RICHR for the amicus curiae brief that it filed in this case.

. Although not material to our discussion here, we do note that plaintiff did not include the objection to summary judgment in her appendix on appeal. Also, it goes without saying that our review of summary judgment is always de novo.

. Unlike in Center for Behavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680, 685 (R.I.1998), defendant raises a challenge to plaintiff's ability to establish her prima facie case on appeal. The defendant argues that plaintiff failed to meet Hurd’s legitimate expectations because of her poor work performance, forgery, and customer complaints. See also Neri v. Ross-Simons, Inc., 897 A.2d 42, 49 (R.I.2006). But see Ashley v. Paramount Hotel Group, Inc., 451 F.Supp.2d 319, 332 (D.R.I.2006) (determining under FEPA that the plaintiff did not meet the employer's legitimate expectations because there was un-rebutted evidence of the plaintiff’s poor work performance). Several federal circuits have discussed the difficulty inherent in denying a plaintiff's prima facie claim on the basis of not meeting legitimate expectations because employers articulate the same legitimate nondiscriminatory reasons for termination used in step two, which essentially forces the plaintiff to argue pretext at the prima facie stage. See Thomas v. Denny's, Inc., 111 F.3d 1506, 1510 (10th Cir.1997); Davenport v. Riverview Gardens School District, 30 F.3d 940, 944 (8th Cir.1994); Siegel v. Alpha Wire Corp., 894 F.2d 50, 54 (3d Cir.1990). We need not, and do not, reach the issue here because doing so is not necessary for us to decide this case.

. Martin filed two affidavits, the first in 2007, and the second in 2011. The 2007 affidavit makes no mention of a review of Bucci's personnel file at any point, but it does refer to ongoing customer complaints about Bucci, her poor attitude, and her poor performance.

. In all likelihood, the complaints from 2001-02 would not constitute hearsay because, as we also discussed in Casey v. Town of Portsmouth, 861 A.2d 1032, 1037 n. 2 (R.I.2004), when considering similar complaints, defendant does not offer the complaints for the *1173 truth of the matter asserted, but to serve as the basis for Martin’s state of mind when he decided to terminate plaintiff. See Wells v. Uvex Winter Optical Inc., 635 A.2d 1188, 1193 (R.I.1994).

. Bucci also contended in her brief, and at oral argument, that the apparent inconsistency between Martin’s affidavit and Mande-ville’s deposition testimony was a material factual dispute that should have been resolved by a jury. We disagree. “A ‘genuine’ issue is one that could be resolved in favor of either party, and a 'material fact’ is one that has the potential of affecting the outcome of the case.” Calero-Cerezo v. United States Department of Justice, 355 F.3d 6, 19 (1st Cir.2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). This dispute does not have the potential to affect the outcome of the case because plaintiff does not challenge the several other offered reasons for her termination, which were sufficient to overcome a claim of discriminatory animus. Indeed, in her brief submitted to this Court, plaintiff acknowledges that Martin based his decision to fire Bucci on what he found in the file and on his own "observations and assessments of her work performance.”

. Bucci's testimony on both of these matter is as follows:
"Q: Do you recall sitting down with Mr. Martin and him talking to you about some changes he wanted to make with respect to the way you had been doing things?
*1177 “[BUCCI]: In my office I had a computer that was just for the Registry, nothing else. So, he had said that he wanted that office to do more than just registrations. He wanted it to do the billing for the wholesale vehicles. I said to him fine. I’ve done that before, so I can do it again.
"So, he was going to make arrangements to have the information put into my computer, which was supposed to be only for registrations. So, he had someone come in to program the whole computer for what he wanted done for the dealership.
"It didn’t work out, because every time I went from the Registry format to the Hurd format, it would kick me out of registrations. So, I ended up calling the Registry every time I got kicked out, and I was told by Mr. Sambento [sic] that that computer should not be used for anything else but registrations.
" * * * If he wanted me to do something else, he was going to have to get me a new computer just for that so I would have two computers.
"They were going to be in the process of doing it and all they gave me at the time was the printer for the billing but never set up the computer for it. It was still that way until I left.”